488 So.2d 801 (1986)
Ernest C. GILL
v.
STATE of Mississippi.
No. 56085.
Supreme Court of Mississippi.
May 21, 1986.
Charles R. Brock, Jackson, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by Leyser Q. Morris, Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
ROY NOBLE LEE, Presiding Justice, for the Court:
Ernest C. Gill was found guilty in the Circuit Court of Winston County on a charge of murder and was sentenced to life in custody of the Mississippi Department of Corrections. He has appealed to this Court and assigns two errors in the trial below.

I.

THE JUDGMENT OF THE LOWER COURT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.
Although not married, appellant and Sherry Slaughter lived together as husband and wife in Louisville, Mississippi. Sherry's cousin, Vidalia, lived in the house with them. On October 25, 1983, about midday, Sherry and Vidalia were cleaning the house when appellant, using profanity, asked *802 what they were cleaning up for. He had a baseball bat in his hand, walked into the livingroom, and smashed the television with the bat. Sherry Slaughter told appellant, "You know that wasn't none of my television. It belonged to your sister." Shortly thereafter, appellant asked Vidalia as to the whereabouts of his bat. About the same time, appellant's two brothers came into the house and sat down. Appellant found the bat, approached Sherry, who was ironing clothes, walked up behind her and struck her in the back with the bat. According to Vidalia, appellant then stated, "I know I going to kill that bitch. I know I going to kill her."
Appellant swung the bat a second time, hitting the wall. Sherry had fallen to the floor and appellant then hit her in the back of the head with the bat and again in the face, the blows being with such force that the bat broke into two pieces. One of appellant's brothers struggled with him and took the handle of the bat from appellant's hands. Appellant ran out of the house, Sherry was taken to the Winston County Hospital Emergency Room, and was later transferred to University Hospital in Jackson, where she died on November 5, 1983, as a result of the injuries.
Under this assignment of error, appellant contends two issues, viz, insanity and lack of intent, should reduce the conviction of murder to manslaughter.
Four (4) expert witnesses were called, two (2) for the State and two (2) for the defense. Those for the defense were an expert in psychology and counseling and an expert in the field of psychiatry. Those for the State were a neurologist at Mississippi State Hospital and Director of the Forensic Unit, and a clinical psychologist.
Appellant's condition was diagnosed as paranoid schizophrenia. The issue to be determined from all the evidence relating to that condition is whether or not appellant knew the difference between right and wrong at the time he killed Sherry Slaughter. The appellant's expert witnesses were of the opinion that appellant did not know the difference between right and wrong. The State's expert witnesses were of the opinion that appellant did know the difference between right and wrong at the time he took the life of Sherry Slaughter, and lay witnesses corroborated those opinions. The issue of sanity at the time of the commission of an offense is for the determination of the jury. Brady v. State, 425 So.2d 1347 (Miss. 1983); Billiot v. State, 454 So.2d 445 (Miss. 1984); Frost v. State, 453 So.2d 695 (Miss. 1984); Collins v. State, 361 So.2d 333 (Miss. 1978); Cole v. State, 405 So.2d 910 (Miss. 1981).
In Brady v. State, supra, at 1349, the Court said: "Juries and trial judges are not bound to accept the testimony of expert witnesses, but may accept or reject parts of that testimony. Matthews v. State, 394 So.2d 304 (Miss. 1981)."
We are of the opinion that the verdict of the jury is supported by the evidence.

II.

THE LOWER COURT ERRED IN DECLINING TO GRANT A MISTRIAL BECAUSE OF NON-SEQUESTRATION OF THE JURY.
When court recessed for a lunch break, the trial judge made the following statement to the jury:
You're going to be guests of the county today. You will be escorted by the sheriff's department and by the bailiffs. You are charged you are not to discuss this case, even among yourselves. The bailiffs are charged in this case to make certain they do not discuss this case with anyone. All right, we will be in recess until one o'clock.
After lunch, appellant's attorney advised the court he had been informed that the jury had violated the sequestration order. He called witnesses to the stand, who indicated that during the lunch break at times only four jurors were under the supervision of bailiffs and that nine other jurors were at other parts of the courthouse. Some of the jurors went into the sheriff's office unaccompanied by a bailiff. One or two female witnesses made telephone calls *803 from the sheriff's office. At one time, five to seven of the jurors were in the bathroom or in the sheriff's office.
Appellant's attorney moved for a mistrial. The State contended that under Uniform Criminal Rules of Circuit Court Practice, Rule 5.07, the trial judge had not ordered sequestration and that the rule had not been complied with. In ruling upon the motion, the trial judge stated: "It was my intention that the jury be sequestered, and I think that was the understanding of both the sheriff and the bailiff." He overruled the motion for a mistrial and stated:
The Court, having listened to arguments of counsel and having heard played back its instructions to the jury before lunch in this matter, finds that while it may have been the Court's intentions that they be sequestered and they maintained together during lunch, the Court finds that was not the instructions given the bailiff in this case. The Court is going to overrule the motion of the defendant in this case.
Uniform Rules of Circuit Court Practice Rule 5.07 provides:
In any case where the defendant is charged with a crime punishable by death and the state seeks to impose the death penalty, the jury shall be sequestered during the entire trial.
In all other criminal cases, the jury may be sequestered upon request of either the defendant or the state made at least 48 hours in advance of the trial. The trial judge may, in the exercise of sound judicial discretion, either grant or refuse the request to sequester the jury. In the absence of a request, the trial judge may, on his own initiative, sequester a jury at any stage of a trial.
The State contends that the assignment is without merit since the appellant was not charged with capital murder. The State further contends that the only ways the jury may be sequestered are: (1) the defendant or the State requests such at least 48 hours in advance of trial, or (2) in the absence of such request, the trial judge may, on his own initiative, sequester a jury at any stage of a trial. By all admissions, the first was not complied with.
We are of the opinion that even though the trial judge may have intended to sequester the jury, he in fact did not implement that sequestration by following Rule 5.07 and by giving specific instructions to the bailiffs and officers, and to the members of the jury. Sequestration of the jury was aborted before it commenced.
There is no contention or proof that the verdict of the jury was affected by what transpired or that the appellant was prejudiced by lack of sequestration. Since the sequestration would have been imposed solely at the discretion of the trial judge, it not having been requested by the parties under the procedure outlined in Rule 5.07, we are of the opinion that the assignment of error is without merit. Gerlach v. State, 466 So.2d 75 (Miss. 1985).
AFFIRMED.
PATTERSON, C.J., WALKER, P.J., and DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.
HAWKINS, J., dissents.
ROBERTSON, J., concurs in dissent by written opinion.
HAWKINS, Justice, dissenting:
The human brain is composed of billions of cells, each of which is capable of storing and transmitting thought. Its immense complexity is a source of as much wonder and awe as our universe. The human mind, a product of that brain, is the greatest gift our Maker has bestowed upon us.
We have barely begun to understand the mind. Vast oceans of the unknown stretch before us. The human race has known for several centuries, however, that there are terrible diseases and deformities of the mind and of the brain.
In the last century we have recognized one of these as schizophrenia. We have not begun to fully understand this affliction, what really causes it, or its cure. Yet its symptoms are quite plain. A type of *804 schizophrenia is paranoid schizophrenia. It is a psychosis, a form of insanity.
Dorland's Medical Dictionary gives the following definitions:
Schizophrenia. Any of a group of severe emotional disorders, usually of psychotic proportions, characterized by misinterpretation and retreat from reality, delusions, hallucinations, ... and withdrawn, bizarre, or regressive behavior.
Paranoid schizophrenia, a psychotic state characterized by delusions of grandeur or persecution, often accompanied by hallucinations.
The Encyclopedia Brittanica states:
Schizophrenia, a term used by psychiatrists for a group of severe mental disorders that generally have in common disturbances of feeling, thought, and relations to the outside world.
4. The paranoid type, which usually arises later in life than the other types, is characterized primarily by unrealistic, illogical thinking, with delusions of persecution or of grandeur, and is often accompanied by hallucinations.
Hallucinations, although not invariably present, are a conspicuous symptom in the hebephrenic and paranoid types. The most common are auditory: the patient hears voices and believes in their reality.
The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 2d Ed. 1968 (DSM-2), defines the diseases as follows:
(1) Psychosis
a. Schizophrenia
* * * * * *
This large category includes a group of disorders manifested by characteristic disturbances of thinking, mood and behavior. Disturbances in thinking are marked by alterations of concept formation which may lead to misinterpretation of reality and sometimes to delusions and hallucinations, which frequently appear psychologically self-protective. Corollary mood changes include ambivalent, constricted and inappropriate emotional responsiveness and loss of empathy with others. Behavior may be withdrawn, regressive and bizarre. The schizophrenias, in which the mental status is attributable primarily to a thought disorder, are to be distinguished from the Major affective illnesses (q.v.) which are dominated by a mood disorder. The Paranoid states (q.v.) are distinguished from schizophrenia by the narrowness of their distortions of reality and by the absence of other psychotic symptoms.
* * * * * *
Schizophrenia, paranoid type
This type of schizophrenia is characterized primarily by the presence of persecutory or grandiose delusions, often associated with hallucinations. Excessive religiosity is sometimes seen. The patient's attitude is frequently hostile and aggressive, and his behavior tends to be consistent with his delusions. In general the disorder does not manifest the gross personality disorganization of the hebephrenic and catatonic types, perhaps because the patient uses the mechanism of projection, which ascribes to others characteristics he cannot accept in himself. Three subtypes of the disorder may sometimes be differentiated, depending on the predominant symptoms: hostile, grandiose, and hallucinatory.
Alexander D. Brooks in his book Law, Psychiatry and the Mental Health System, makes the following observations about a paranoid schizophrenic:
The paranoid schizophrenic may suffer from a belief that he is under hostile scrutiny or influence of others, such as the FBI or CIA, or under the control of some malevolent extraterrestrial or highly refined technological device such as a Martian communication system or radar. A familiar delusion is that one is observed by the "evil eye." [Citation omitted] Paranoid schizophrenics characteristically receive "messages" on the radio or television, from a radiator, or in dreams. Special significance may be attached to a trivial event. The act of reaching in one's pocket for a handkerchief *805 may be perceived as reaching for a knife or a gun.
* * * * * *
At an advanced stage of his illness the paranoid schizophrenic may abandon external events and base his delusion entirely on a hallucinated event. But this is an extreme form. In one case a paranoid patient "sat in a truck going down a main thoroughfare and thought she saw crowds lining the street cheering her."
The hostility and aggression of the paranoid schizophrenic may find expression in criminal activity, giving rise to the notion that he is dangerous. But there is no meaningful data on the extent of risk presented by paranoid schizophrenics. In any event, the paranoid schizophrenic may attempt to vindicate an imagined wrong. He might wreak vengeance on a supposed enemy, or he might punish a spouse for imagined infidelity.
* * * * * *
Is the paranoid schizophrenic "dangerous"? It should not be assumed, despite these illustrations that all paranoid schizophrenics are dangerous or that any given paranoid schizophrenic is dangerous. Nevertheless, many psychiatrists argue that a diagnosis of paranoid schizophrenia strongly indicates dangerousness... .

FACTS
Let us now meet Gill. From this extraordinarily well tried and well defended case we know a lot about him.
He is illiterate. Out of 64 words shown him by a psychologist at Mississippi State Hospital, he could read "in" and "milk", none of the others. Such words as "city", "tree", "animal", "chin", "split", "form" were beyond him.
Nathaniel Kelly, a Louisville city policeman, had known Gill for five years, and knew him prior to the killing on October 25, 1983. He knew Gill had been committed to a mental institution. He had seen Gill acting strangely, and when the officer would stop to speak to him, Gill appeared not to know him. He knew Gill's brother had likewise been committed to a mental institution.
Ricky Calloway, another city policeman, had known Gill for several years, and upon several occasions had noticed him acting strangely. One warm day Gill was in jail, and Callaway noticed Gill had wrapped himself in a blanket, and was "staring off in space."
On another occasion Calloway had gone to Gill's residence to answer a call. When he approached the house, it "sounded like they were tearing the house down." Calloway found Gill in the back bedroom "throwing stuff around in the room, and mumbling and talking like somebody out of their head." When Calloway and another officer tried to calm him down, Gill got more violent, picked up a chair and threw it out the window. Calloway also knew Gill's brother was a mental case.
Barney Holdiness was a jailer when Gill was in jail. He testified:
A. Well, when they first brought him in and locked him up, he'd bang on the bars and try to climb them. Went up there on several occasions and he'd be setting in the corner wrapped in a blanket. Then he got to where he'd pull his clothes off most of the time. And, he stuck his head in the commode and flooded the jail.
Holdiness had seen him stick his head in the commode on several occasions. He recalled one occasion when he saw that Gill had shredded his bed clothing, balled it up, and stuck some of it up his rectum. Gill would not eat. He had seen Gill walking around his cell naked, with coat hangers tied around his neck.
When he tried to talk to Gill, he got no sense out of him.
In March, 1983, Gill was sent from the Winston County chancery clerk's office to a county office of Community Counseling Services, where he asked to be sent to Whitfield. He said he had head trouble and made some vague references to delusions and hallucinations. The counselor said it was quite unusual for a person to *806 request to be sent to Whitfield. Gill told a counselor that all his life he had been told he was crazy. The counselor thought he could be treated with drugs, and made appointments for him to see the staff psychiatrist, but he never returned.
On June 24, 1983, upon the affidavit of Sherry Slaughter, the subsequent victim, Gill was committed by the chancery court to Whitfield where he was diagnosed as psychotic, paranoid schizophrenic. He was 31-years-old. When he got to Whitfield he was having hallucinations. The attending physician found that after time medication relieved his more marked and aggressive symptoms, and he was released on a pass August 8, 1983. Two weeks later the hospital discharged him.
As noted in the majority opinion, Gill is a classic example of a paranoid schizophrenic. Every expert who interviewed, counseled or treated him came to this conclusion.
On October 25, 1983, mumbling to himself, and armed with a baseball bat, after first destroying a television set he struck Slaughter from behind, hitting her three times, and killing her. He had cursed her, saying, "I know I'm going to kill the bitch."
After his arrest Gill was again committed to Whitfield. He could never believe he had killed Slaughter. When he would be told that he had done so, he would cry.
His reason for clubbing Slaughter? She had "hoo-dooed" him.
According to the experts his symptoms would abate while he was on certain specific medication, but he would be dangerous if he stopped taking the medicine. He would hear voices, have hallucinations. He had delusions of persecution, believing people were trying to harm him, that they were putting the "hoo-doo" on him. He could hear God speaking to him, and had seen God. He said this happened every day, and that he and God had played together.
All doctors explained paranoid schizophrenia in the same way it is explained above. All said he was psychotic, and had a serious mental illness.
Three of the experts, however, were of the opinion that Gill knew the difference between "right and wrong," and understood the nature and quality of his act.

SHOULD GILL BE CONDEMNED?
I have begun to have some problems with the M'Naghten Rule; it is too simplistic. What does "not knowing the difference between right and wrong" mean? Sane people struggle with this. Is a state sponsored lottery right or wrong? A little over one hundred years ago this Nation endured a bitter four-year Civil War. In my reading of history I cannot recall any leader from either side ever acknowledging morality was not on his side. (There may have been such an individual, but if so, he was in a distinct minority.)
So much for M'Naghten as a general proposition. But, it is said, the rule applies to a situation where any sane person would know whether it is morally right or wrong to commit the act, such as stealing, robbing, or in the case of a paranoid schizophrenic, assaulting or killing.
Why doesn't the rule apply to Gill's psychosis?
Abstractly a paranoid schizophrenic (if his mind is not too deranged to be able to think at all) knows it is wrong to steal, he knows to go to church on Sunday. He may know to eat his wheaties. Befuddled as his mind is, he may very well know it is wrong to injure or kill another person in the abstract. The trouble is that in his freak mind he has done a proper thing in injuring or killing, as a normal person might consider it proper to shoot a burglar entering his house at night, or shoot a violent attacker upon himself or family.
In a paranoid schizophrenic's mind the person he stabs, chops, clubs or shoots may have been about to drop a nuclear bomb, throw acid on him, or wreak some other terrible catastrophe. Indeed, in the paranoid schizophrenic's mind he frequently is *807 acting upon direct instruction from the Lord.
Even the second prong of the M'Naghten Rule, whether he realizes the nature and consequences of his act, hardly suffices. While he may very well know he is hurting another, his delusion compels a mind-set he acts from an absolute necessity.
Our legal test, in fact, makes little sense to psychiatrists. See: Groseclose v. State, 440 So.2d 297 (Miss. 1983), Justice Robertson's specially concurring opinion at p. 302.[1]
A more accurate test, I would suggest, is whether the paranoid schizophrenic was so deranged that he was incapable of knowing the person he assaulted or killed was an individual who posed no threat whatever to his or anyone else's well-being or safety.
Born and raised with a crippled, disordered brain process, a useless derelict, it would be difficult to envision any human being treated more harshly by fate than Ernest Gill. What normal person would not a thousand times rather be dead than live cursed with such a deformed mind?
On October 25, 1983, he brutally and senselessly slew Sherry Slaughter, one of the few people in his short life who ever treated him kindly, and probably the only person on this earth who saved him from sleeping in barns and on ditch banks, begging food or eating out of garbage cans. He had been living with her for several years; she may very well have been the kindest person he ever knew.
Was killing her the act of a criminal, a person who has the capacity to think, to make choices? Of course not.
If he had never been caught, would it have benefitted him in the least?
*808 He was as surely demon possessed as any character in the Bible; his demon was paranoid schizophrenia.
Let us pose this example:
Let us suppose a doctor in a hospital, without a patient's consent or knowledge, injects him with some drug which makes the patient have wild, insane hallucinations so that he grabs a knife and slays some child.
If there were no doubt in our minds that the killing would never have occurred except for the fact that the patient was deranged on drugs, would civilized society ever condemn him? We would not look to the patient, but to the other cause, the doctor.
Well.
God Almighty gave Gill the only mind he has ever had. He has had no more control of the monsters in his brain than of the moon, or the earth's seasons.
On October 25, 1983, Gill was an object of pity. On that day he did something to make him far more pitiable.
He killed the one person who, in his right mind he may very well have been willing to die for.
To a creature thus cursed by fate, must we, calling ourselves civilized, add to his misfortune by condemning him as a cold-blooded murderer? To spend the rest of his life condemned and treated as a criminal rather than as a mentally disturbed person who should not be blamed for his condition?
I think we owe it to our Maker, who has been far kinder to us, to somehow try and treat this hopeless, deformed man with some compassion. Can we possibly think we will not ourselves some day be judged for the manner in which we treat human beings such as Gill?

ANOTHER COURSE
The first and most obvious course is for our state to have the facilities and personnel to house individuals whose mental illness makes them potentially dangerous. This is the third murder case since I have been on this Court in which a dangerously ill individual was released by a state mental institution. Edwards v. State, 441 So.2d 84 (Miss. 1983); Neal v. State, 451 So.2d 743 (Miss. 1984); and now this one. In Neal I made this comment:
Society must be protected from individuals such as this, and it is miserably poor economy to contend the state lacks funds to keep them in custody.
451 So.2d at 764.
In a footnote in the same case I made the following statement:
This is an excellent case for a study of our state mental institutions to determine (1) Why is it that dangerous individuals are discharged upon society? (2) What safeguards are given towards informing the family and law enforcement officers when a potentially dangerous person is discharged?
This case involved a mentally warped person and his close kin. It would appear that if they had been given any warning at all he could be dangerous, this tragedy may well have been avoided.
Simply putting Neal away now should not end the inquiry, Rather, it should begin an investigation by appropriate state officials of why this tragedy had to happen. Other similar tragedies may thus be prevented.
451 So.2d at 764.
How many Neals, Gills and Edwardses are there on the streets now, discharged from a mental institution without supervision or protection? How many more police officers must be killed as in Edwards v. State and Laney v. State, 486 So.2d 1242 (1986); how many innocent people, before the message gets across that, aside from humanitarian it is a lot cheaper to prevent these homicides than to prosecute them?[2]
*809 It is a matter of common knowledge, indeed subject to judicial notice, that chancery courts throughout this state commit paranoid schizophrenics to a state institution only to have them released a few days or weeks later. This makes no more sense than opening the doors to a penitentiary.
The experts from a state mental institution called upon to testify in the criminal prosecution of one of their discharged patients in fact have a conflict of interest. If they testify the individual is not criminally responsible, they are subject to being asked, why did you release him to begin with? Also, if they testify he is not criminally responsible, the defendant is returned to them as a permanent patient, the same individual they turned loose a few months previously after a brief stay, because they did not have the facilities or personnel to care for him. This puts too much temptation on such expert to testify he was criminally responsible. In this way, at least, Parchman and not Whitfield will have to take care of him.
All this transpires, I suspect, from the simple fact that our mental institutions do not have the facilities or personnel to care for and treat the Neals, Gills and Edwardses of this state.
While it is not the function or responsibility of this Court to express our views upon problems purely legislative in nature, in my view this subject is an imperative exception.
I have no doubt that the jury which tried Gill were as convinced as this Court that he is insane; yet they may have felt they had no choice. Unless Gill were sentenced to imprisonment, the people of Winston County would have no protection.
There are cheaper ways, there are more humane ways.
There is another disturbing aspect about homicides committed by a discharged paranoid schizophrenic. They usually kill the unwary. It is some loved one who simply cannot believe he is dangerous, an unsuspecting police officer, or some innocent, unaware individual.
At the very least, when these patients have been discharged, the local sheriff's office, the county welfare department, the county health department, and the family should be told they are potentially dangerous. Such warning would have at least give some chance of saving the lives of law enforcement officers such as in Laney and Edwards.

CRIMINAL PROCEEDINGS
Insofar as criminal proceedings are concerned, Justice Patterson in a concurring opinion in Lias v. State, 362 So.2d 198 (Miss. 1978), Patterson specially concurring, p. 202, set forth the procedure I would follow, and I would abolish the M'Naghten Rule in cases involving a paranoid schizophrenic.
ROBERTSON, Justice, concurring:
There is much in Justice Hawkins' eloquent and sensitive dissenting opinion with which I am in sympathy. I have long shared the views there expressed regarding the rational irrelevancy of the M'Naughten Rule to the determination of criminal responsibility. I once as a lawyer argued that view before this Court and attracted three votes. See Hill v. State, 339 So.2d 1382, 1386-89 (Miss. 1976) (concurring opinion).
My present views, deeply felt and strongly held, are set forth in my concurring opinions in Groseclose v. State, 440 So.2d 297, 302-06 (Miss. 1983), and in Laney v. State, 486 So.2d 1242, 1247 (Miss. 1986). Consistent with my Groseclose and Laney opinions, I would abolish the insanity defense, affirm the judgment that Ernest C. Gill is guilty of murder, and implore the Department of Corrections that it provide custody for Gill with an ideal mixture of security, professionalism and humanitarian concern.
NOTES
[1] In examining three of the experts, Sandy Balistrieri, Margie Glen Lancaster and Helen Robertson, the district attorney developed that the word "insanity" is not a medical term at all, but a legal term; that the M'Naghten rule for determining insanity was a purely Legal, not a medical test, that had nothing whatever to do with medical diagnosis or treatment. Indeed, one testified the word "insane" never appears in the DSM (Diagnostic and Statistical Manual).

So, we have psychiatrists testifying as experts on a word which has no medical significance to them whatever. Of course, a psychiatrist is in no better position to pass upon a legal test than any intelligent layman; indeed, insofar as giving an opinion on a legal matter, he is a layman.
The absurdity appears when we consider that Gill:
1. Had one time pulled a knife on his sister's children and was going to cut his sister's head off with a knife.
2. Was at times off in a trance, and no one could communicate with him;
3. Tied coathangers around his neck and walked around naked.
4. Stuck his head in a commode and tried to flush it;
5. Tore up bedding and attempted to stuff shreds up his rectum;
6. Climbed the walls of his jail cell;
7. Thought people were trying to "hoo-doo" him, something very terrible and wicked to him;
8. Hallucinated;
9. Had daily conversations with God; in fact, played with Him; and was a classic paranoid schizophrenic.
Yet nevertheless we had psychiatrists solemnly pontificating this did not necessarily mean Gill was "insane."
Of course, no psychiatrist really believes this. In fact, any person who really believes a person who did all the things Gill did is not insane (in the way this word is commonly understood by laymen and lawyers) probably should be locked up himself.
Then, why would a psychiatrist say a person with Gill's mind was not necessarily "insane"? Because in his opinion he "knew" the difference between right and wrong.
What medical basis is there for this statement? None. The psychiatrist is no better off than anyone else to pass judgment on this question. What is right or wrong depends on the circumstances existing at the time, and it is a legal and moral question, not medical.
There is nothing whatever in the specialized training of psychiatrists with degrees in doctors of medicine which helps them determine whether any given individual knew the difference between right and wrong.
Their foundation for expressing opinions on this question is no better than anyone else's: common experience and judgment.
Why ask a psychiatrist this question at all? Why indeed give him any credence as an expert on the question? If we make no better improvement towards understanding and communicating whether a person should be held morally responsible for his conduct than this, a thousand years from now psychiatrists will still be disputing in court whether or not a person is insane.
[2] There was an old saying in Chickasaw County when I grew up, "You ain't learned nothing the second time a mule kicks you."