568 So.2d 1173 (1990)
Eula ROUNDTREE
v.
STATE of Mississippi.
No. 07-KA-59144.
Supreme Court of Mississippi.
October 3, 1990.
Alvin M. Binder, Wayne Milner, Binder Milner & Milner, Jackson, for appellant.
Mike C. Moore, Atty. Gen., John R. Henry, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before DAN M. LEE, P.J., and PRATHER and SULLIVAN, JJ.
PRATHER, Justice, for the Court:

I. INTRODUCTION
This case involves an appeal by Eula Roundtree, who was convicted by a jury two years ago at the Hinds County Circuit Court for the murder of Clara Porter. Eula was sentenced to life imprisonment, and this Court affirms.

*1174 A. The Facts According to Eula

At trial, the defendant, Eula Roundtree, provided the following version of the facts.
In 1983, Eula met Sgt. Cleon Butler of the Jackson Police Department. They decided to marry in June 1983, but Cleon changed his mind and married another woman, Debra, in May, 1983. Almost immediately after Cleon and Debra married, Cleon assured Eula that he would divorce Debra and that they would eventually marry as previously planned. With this assurance in mind, Eula was persuaded by Cleon to spend a lot of money on him; for example, she bought him new tires for his automobile, a bedspread for his and Debra's marital home, as well as draperies and blinds. She even loaned him $1,500.
Cleon's assurance, Eula soon learned, was an insincere one. He did separate from Debra and divorce her after approximately one year of marriage. Cleon and Eula did re-commence their relationship. However, Eula discovered that Cleon was also seeing other women  including Clara Porter, who Eula warned to "stay away" from her fiance. Her warning was to no avail; Cleon and Clara continued to see one another. Meanwhile, Cleon would call Eula on numerous occasions and persuade her to come to his house and have sex. Sometimes, he would physically and mentally abuse her. For example, he would call her names, embarrass her in front of others, and beat her. On a few occasions, he threatened her with a knife or a gun.
Eula's emotional state worsened as Cleon's abusive nature and broken promises became a customary matter in her life. She cried constantly, couldn't eat, lost weight, and missed work often. She contemplated suicide and ultimately sought help from the Family Services and Mental Health Center  with which she made often-unkept appointments.
On March 10, 1987, Eula purchased a gun and ammunition. Nine days later, she went to Cleon's home and waited on the porch for him to return from work. Her plan was to commit suicide; instead, she fatally shot Clara Porter who showed up unexpectedly. Eula explained that she did not mean to shoot Clara; in fact, she doesn't really know what happened. The gun simply "went off two times in rapid succession" when Clara screamed in response to seeing Eula with a gun.
Eula claims she was "M'Naghten insane" at the time of the shooting and, that she should be found innocent as a consequence.

B. The Facts According to the Prosecution
The prosecution disclosed during the trial that Eula first denied responsibility for the shooting. But Eula later confessed while being interviewed by investigators several days after the incident. (She had been advised of her Miranda rights, which she expressly waived.) The following is a transcript of her confession:
My name is Eula Roundtree and I am 31 years old. I went to College and have a degree. I can read and write. The following is my statement about my shooting Clara Porter.
Sometime Thursday night after dark, I went to Cleon Butler's house at 148 Iris Street. I went past Cleon's house for about three or four houses. I parked my car between two houses on the street. I walked back up to his house and waited by the front door. I waited about thirty minutes. I had my gun in my pocket. I was wearing a small [sic] purpose jacket with some pockets in it. I had the gun in the pocket of my jacket. I think I might have knocked on the door of the house but nobody came to the door so I just stood there and waited. I saw Clara's car come into the drive. She got out of the car and came up to the door. She started to open the door and I guess she heard me or something. I guess she was facing me. I don't know. I started shooting. I shot once. Clara screamed. I shot again. I didn't see her fall. I guess I closed my eyes. When I opened them, Clara was lying on the ground. I went over to see about her. She was breathing but I was scared to call anybody. I walked back to my car. I got in my car and went back up Northside Drive to 220. I went south on 220. After *1175 I got on 220, I threw the gun out the window into the median of the highway. I had loaded the gun with six bullets. I had loaded the gun just before I got out of the car at Cleon's house. When I threw the gun away, I threw away the box of bullets also. I had left the box of bullets in the car when I went to the house.
About a week or two weeks ago, I went to a pawn shop on McDowell Road and bought the gun. I just ask for a small gun. A black man waited on me. He sold me a small gun. It had a book with it. I took the book with me to K-Mart on 80 later and bought some bullets for it. The gun was black. I bought the gun to shoot myself. I read the book and loaded the gun while I was sitting in the parking lot at my apts. while I waited on my car to warm up.
Q. Who did you go to Cleon's house to shoot?
A. I don't know who I was going to shoot but I was going to shoot somebody.
Q. Why did you want to shoot somebody?
A. Because I felt so bad. I felt like Cleon had used me and then he didn't want me no more.
Q. Did you think that Cleon or Clara might be there when you got there?
A. Yea, I knew somebody would be there sooner or later.
Q. Did you give the above statement of your own free will, without any promises, threats or coercion of any kind being used against you?
A. Yes.
Q. Is the above statement true and correct to the best of your knowledge?
A. Yes.
Witnesses: s/P.S. Knowles
Witnesses: s/J.W. Monrow
Signed: Eula RT
Date: 3-23-87 1200
The prosecution contended that, at the time of the shooting, Eula was cognizant of the criminality of her act, knew the difference between right and wrong, and should be held fully responsible.

C. The Witnesses' Revelations and Other Evidence
The following is a summary of the testimony provided by the witnesses.
Eula's purchase of the gun used to kill Clara was corroborated by Kenneth Johnson, co-owner of the pawnshop, who also provided investigators with: (1) a gun-purchaser's information form completed by Eula, and (2) a video recording of Eula purchasing the gun.
Fulton Porter testified that his mother, Clara, received numerous life-threatening phone calls from Eula over a lengthy period of time.
Dr. Rodrigo Galvez performed the autopsy on Clara and testified that Clara was shot twice  once in the chest and once in the head.
Cleon testified next. He denied ever making marriage proposals to Eula and denied abusing her or threatening her with a knife or gun. He admitted to having sexual encounters with Eula from 1983 to late 1986. He corroborated Fulton Porter's testimony and explained that he was sometimes present when Clara received numerous life-threatening phone calls from Eula. He also explained that, a few days after the murder, Eula called him and asked him to meet her at a specified McDonald's Restaurant. Cleon and another police sergeant met her inside the restaurant, where she was arrested after confessing that she "did it."
Dr. Robert M. Ritter, a board-certified psychiatrist testifying for the defense, examined Eula approximately 26 times after the shooting and testified as an expert witness for the defense. Specifically, Ritter testified that Eula suffered from depression and was suicidal as a consequence of being "jilted" by Cleon. He added that her depression probably "substantially impaired her capacity to appreciate the criminality of her conduct." However, Ritter noted that: "From an academic standpoint, ... she knew the difference between right and wrong." Moreover, he "emphasized that [he] didn't believe it [the criminality or *1176 consequences of her act] mattered to her." Vol. IV, at 376-79; see also id. at 369 ("I will not say that she did not know the difference between right and wrong."). All these admissions notwithstanding, Ritter contended that she should not be deemed responsible for her actions. Ritter testified outside the jury's presence, that his opinion was that Eula was M'Naghten insane. The trial judge prohibited Ritter from testifying, in the jury's presence, that Eula met the M'Naghten test.
Eula's father, mother, and sister testified next. Basically, they described Eula's emotional state as out of control. All three family members corroborated Eula's claim that she and Cleon discussed marriage. Friends of Eula testified about her "good" character.
Doc Thaggard, a Jackson police officer assigned to the Hinds County District Attorney's Office, testified that he and Assistant District Attorney Delaughter interviewed Dr. Ritter about Eula's state of mind. According to Thaggard, Ritter conceded during the interview that Eula did not suffer from "delusions." See STEDMAN"S MEDICAL DICTIONARY 373 (5th ed. 1982) ("Delusion" is defined as "a false belief or wrong judgment held with conviction.").
Billy Fox, a Jackson psychologist, examined Eula approximately one month after the shooting occurred and testified as an expert witness for the prosecution. Specifically, Fox testified that, at the time of the examination, Eula was not "psychotic"; however, he did make three "diagnostic impressions." These included: (1) dysthymia, which is a mood disorder (e.g., manic-depressive); (2) histrionic or hysterical personality; and (3) passive-aggressive personality. He additionally opined that Eula was not suffering from delusions. Fox contended there is a "reasonable probability" that, at the time of the shooting, Eula "knew the difference between right and wrong" and "understood" and "appreciated" the "nature of the act."
Other evidence included a letter from Dr. Donald C. Guild, the "psychiatrist of the court" who examined Eula in order to determine whether she was competent to stand trial. Guild explained that Eula appeared to be a "very agitated and depressed lady" who "would be best diagnosed" as "suffering from a major depression" at the time of the shooting. Guild added that she "was not controlling her actions well and was on a self destructive course." This notwithstanding, he concluded that she was not "M'Naghten insane," should be deemed "responsible for her actions," and was competent to stand trial.
Finally, a report from the Jackson Mental Health Center was introduced by the prosecution. The report was based upon a psychiatric evaluation of Eula and concluded that she was merely suffering from a "minor case of depression." The actual report was not included in the record, but was discussed during Dr. Ritter's testimony.

D. The Jury's Verdict
During the closing argument, the defense asked the jury to find Eula not guilty by reason of insanity. After being instructed on the elements of manslaughter and murder, the jury found her guilty of latter offense  for which she was sentenced to life imprisonment.

E. The Issues
Four issues have been presented on appeal. They are reproduced verbatim:
(1) "Whether the Court erred in granting the State's manslaughter instruction No. [9] over the objection of the Appellant Roundtree;
(2) "Whether statements made by the prosecution referring to other murders in the area which were not in evidence so prejudiced Roundtree that such could not be cured by further instructions by the Court;
(3) "Whether the Court erred in disallowing Dr. Ritter to state that in his expert opinion Roundtree met the M'Naughton [sic] standard of insanity while allowing the State's witness, Dr. Fox, to testify that in his expert opinion the Appellant did not meet the M'Naughton [sic] standard of insanity; and
*1177 (4) "Whether the verdict of guilty was against the overwhelming weight of the evidence".

II. ANALYSIS

A. Issue No. 1

1.
At trial, Eula found Instruction No. 9 objectionable because it "refers to passion but does not refer to the lack of intent or lack of premeditation or lack of malice aforethought." Restated, Eula requested the judge to add the word, "aforethought," after each occurrence of the word, "malice," in order to "prevent conflicting jury instructions on manslaughter and murder. The judge complied with Eula's request.
Curiously, Eula appealed the granting of the instruction  notwithstanding the judge's compliance with her request. She now contends that the instruction should not have been granted because it abrogated her constitutional rights to a fair trial and due process. More specifically, it "force[d] the jury to accept an unwarranted assumption that in order to convict of manslaughter, then they must first presume that she had the intent to kill Clara Porter."
Eula additionally contends that the instruction "unconstitutionally shifted the burden of proof forcing her to convince the jury beyond a reasonable doubt that her intent to kill arose from sufficient provocation."

2.
This Court could decline to address the merits of the issue since Eula does not rely on a ground stated in the objection made at the trial level. See, e.g., Crawford v. State, 515 So.2d 936, 938 (Miss. 1987) (This Court held that the assigned error "will be denied ... because it does not rely upon the ground stated in the objection interposed to the lower court, and the objection was not properly preserved for appellate review.") (citing MISS.SUP.CT.R. 42, and numerous cases for authoritative support).
Procedural bar aside, Eula's contention is devoid of substantive merit. Instruction No. 9 is clear and unambiguous. Its language did not "force" the jury to "accept an unwarranted assumption that in order to convict [Eula] of manslaughter [it] must first presume that [Eula] had the intent to kill Clara." Nor does its language shift the burden of proof to Eula. Perusal of all instructions reveals unequivocal placement of the burden of proof on the prosecution. For example, Instruction No. 12 placed the burden on the prosecution to prove elements of murder or manslaughter beyond a reasonable doubt, and Instruction No. 3 placed the burden on the prosecution and noted that it "never shifts to the defendant."
In sum, when reading all the instructions as a whole, this Court can only conclude that the jury was adequately instructed. Eula's contentions are rejected on both procedural and substantive grounds.

B. Issue No. 2

1.
At trial, Eula objected to the following remark made by the prosecutor during his closing argument:
And quite frankly, I think the people of Hinds County are absolutely fed up to here with waking up every morning of our lives and seeing where another body has been discovered.
Vol. V, at 552. Eula contended that the remark "project[ed] other crimes in the issue" and requested the jury be directed to "disregard" it. The trial judge agreed, directed the jury to disregard the remark, and ordered the prosecutor to "confine" his argument to the case sub judice. Eula then moved for a mistrial, which the judge denied.

2.
Case law unequivocally holds that the trial judge "is in the best position for determining the prejudicial effect" of an objectionable remark. See, e.g., Alexander v. State, 520 So.2d 127, 131 (Miss. 1988). The judge is provided considerable discretion to determine whether the remark is so prejudicial that a mistrial should be declared. Edmond v. State, 312 So.2d 702, *1178 708 (Miss. 1975). Where "serious and irreparable damage" has not resulted, the judge should "admonish the jury then and there to disregard the improp[riety]." Johnson v. State, 477 So.2d 196, 210 (Miss. 1985) (citing numerous supportive cases). See also Gray v. State, 549 So.2d 1316, 1320 (Miss. 1989); Brown v. State, 534 So.2d 1019, 1024 (Miss. 1988); Estes v. State, 533 So.2d 437, 439 (Miss. 1988) (citing Wetz v. State, 503 So.2d 803, 810 (Miss. 1987); May v. State, 460 So.2d 778, 783 (Miss. 1984); Shelby v. State, 402 So.2d 338, 340 (Miss. 1981)).
In applying the law to the facts in the case sub judice, this Court concludes that the trial judge did not abuse his discretion by refusing to declare a mistrial. The remark was improper but its prejudicial effect, if any, was "cured" by the judge's admonishment that it be disregarded. Compare with Alexander, 520 So.2d at 131 (The impropriety of the following remark was deemed cured by the judge's admonishment: "Thank God we didn't have a murder."); Crenshaw v. State, 520 So.2d 131, 134 (Miss. 1988) (The prejudicial effect of the prosecutor's closing remark through which he improperly "delv[ed] into matters concerning" other individuals was "dissipated" by the trial judge's admonishment that it be disregarded.); McFee v. State, 511 So.2d 130, 135 (Miss. 1987) (The prejudicial effect of the prosecutor's opening and closing remarks  through which he referred to the defendant as "animalistic" and explained that the "only thing that will put [the victim's] spirit to rest is to convict [the defendant]"  was deemed sufficiently dissipated by the judge's admonishment that they be disregarded.); Carleton v. State, 425 So.2d 1036, 1039 (Miss. 1983) (District Attorney's remarks  that the defendant's defense was a "flim-flam defense," that the conditions of the penitentiary are excellent with air-conditioned buildings," and that "when you [the jury] go back [to deliberate] ... you are going to find that this can be nothing but murder [for] which we have got to let people know what the people of Harrison County stand for"  were deemed harmless in view of the judge's admonishment that they be disregarded.).

C. Issue No. 3

1.
Subsequent to the grand jury's indictment of Eula, the prosecution was informed that the insanity defense would be used and that Dr. Ritter would be presented as its expert witness. During the trial and outside the jury's presence, Ritter testified that Eula "did not appreciate her actions" when she shot Clara and that, consequently, she met the M'Naghten test for insanity. At the conclusion of Ritter's testimony, the trial judge ruled that:
The science of psychiatry and the law have an uneasy conjunction on the issue of insanity. [Ritter] may testify as to his opinion. He may not testify that in his opinion [Eula] did or did not meet the ... "M'Naghten test." This is a legal question for first the judge to instruct the jury, and second a factual question for the jury to determine itself. He may testify as to his opinion as to whether or not she knew the nature and quality of her act ... whether she knew it was right or wrong. And he may also testify concerning her appreciation of those acts.
Vol. IV, at 350-52.
Later, during the State's direct examination of its expert witness, Dr. Fox, the following question was asked: "[B]ased upon your experience in the field of psychology, based upon your personal clinical examination of [Eula] ... and based upon your analysis of the tests administered to her by you, do you have an opinion ... as to whether or not [Eula] knew the difference between right and wrong [at the time of the shooting]?" Fox responded: "I think, like some of the other experts ..., this is a very close one. I personally do not feel that the M'Naghten rule was met in this case."
Notably, Eula did not object to Fox's reference to the M'Naghten test, which was admittedly violative of the judge's earlier ruling. Even more notable is Eula's own question asked of Fox during her *1179 cross-examination of him: "[Dr. Guild opined in a letter to the trial judge that `a]lthough this is a case that is close, I feel... [Eula] still does not meet the M'Naghten test.' Correct?" (Fox responded, "Yes.").
On appeal, Eula contends that the trial judge erred: (1) by prohibiting Ritter from testifying that the M'Naghten insanity test was met (2) while permitting Fox to testify that the test was not met.

2.
Eula contends that "without Dr. Ritter's testimony on the issue of M'Naughton [sic], the jury was not properly guided as to [her] mental state." She adds that the absence of such guidance was "prejudicial" and violative of case law, rules of evidence, and the federal and state constitution. Appellant's Brief at 14-16 (citing the federal and state constitutions, case law, and MISS.R.EVID. 704).
Eula also contends, that the judge's prohibition of Ritter's testimony (i.e., that the M'Naghten test was met) and permission of Fox's testimony (i.e., that the test was not met) was simply unfair in view of the fact that Ritter "conducted some twenty-six sessions with [her]" and Fox conducted only one. "Ritter's testimony would have directly impeached the testimony of [Fox]."

3.
The State contends the trial judge correctly ruled that the question regarding the M'Naghten test was a legal issue and not a medical one. The State adds that this Court has "pointed out that the M'Naughton [sic] standard is a purely legal standard ... unknown in the field of psychiatry." Moreover, this Court has "stated that the phrase `M'Naughton [sic] insane" has no medical meaning or significance." In sum, Ritter was not qualified under the rules of evidence to express a legal opinion "on anything."
Finally, the State contends that Eula should be procedurally barred from complaining that the judge erred by permitting Fox to testify about the M'Naghten test: (1) because she failed to object to Fox's non-responsive answer, and (2) because she failed to request that Ritter be recalled to rebut Fox's testimony. The error was harmless because: (1) the prosecution gained "no particular unfair advantage," and (2) the unresponsive answer presumptively had no affect on the outcome of the case.

4.
This Court has never expressed any qualms about an expert testifying as to whether the M'Naghten test was met in a particular case. That is, in virtually every Mississippi case in which a defendant's sanity was an issue, the evidence included testimony by psychiatrists or psychologists who referred to the M'Naghten test and whether it was met. See, e.g., Davis v. State, 551 So.2d 165, 173 (Miss. 1989); White v. State, 542 So.2d 250, 251 (Miss. 1989). In addition, research revealed no case involving the prohibition of such testimony.
A liberal reading of the Miss.R.Evid. 704 arguably could lead one to conclude that such testimony is admissible. Rule 704 expressly declares that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the jury."
All the preceding notwithstanding, the trial judge's prohibition of Ritter's opinion was proper. Entrenched law dictates that "[q]uestions which simply allow the witness to tell the jury what result to reach are impermissible, as are questions asking the witness for a legal conclusion." May v. State, 524 So.2d 957, 964 (Miss. 1988); Dale v. Bridges, 507 So.2d 375, 378 (Miss. 1987); see Owen v. Kerr-McGee Corp., 698 F.2d 236, 240 (5th Cir.1983) ("[T]he task of separating impermissible questions which call for ... legal responses from permissible ones is not a facile [one]."). For example, in a will contest, the question  "Did the testator have the capacity to make a will?"  is not permitted. Conversely, the question  "Did the the testator have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?"  is permitted. *1180 MISS.R.EVID. 704 Comment (citing FED.R.EVID. 705 Advisory Committee's Note).
Whether a defendant is M'Naghten insane is a mixed question of fact and law.
Witnesses are presented pro and con. The jury is instructed, and then asked to determine whether the defendant was legally sane at the time of his [or her] actions.
Groseclose v. State, 440 So.2d 297, 303 (Miss. 1983) (Robertson, J., specially concurring); see Gill v. State, 488 So.2d 801, 807 n. 1 (Miss. 1986) ("[T]he M'Naghten rule ... [is] a purely Legal, not a medical test.") (Hawkins, J., dissenting). Whether Eula was M'Naghten insane at the time of the shooting was purely a legal question which the trial judge logically prohibited Ritter from answering. Accord id. at 807 n. 1 ("[W]e have psychiatrists testifying as experts on a [matter] which has no medical significance to them whatever.") (Hawkins, J., dissenting).
The jury was provided ample evidence and instructions from which to determine whether, as a matter of law, the M'Naghten test was met. Cf. Warren v. State, 285 So.2d 756, 760 (Miss. 1973) (where this Court held that the State did not commit a "fatal error" by failing to provide an expert witness (a psychiatrist) an opportunity to testify about the defendant's sanity  since the witness' testimony "is but one part of the evidence, and the defendant's sanity ... is to be determined from the whole of the evidence").
Finally, this Court rejects Eula's contention that the judge committed reversible error when he permitted Dr. Fox to testify that the M'Naghten test was not met. First of all, the judge did not "permit" Fox to testify on the matter. Fox's testimony was, in essence, a non-responsive "slip" which neither the State nor the judge anticipated. Once Fox "slipped up" and opined that the M'Naghten test had not been met, Eula surprisingly did not object. In fact, Eula herself subsequently quoted in the presence of the jury Dr. Guild's written opinion that the test had not been met. Eula never requested that  in view of Fox's "slip"  she should be permitted to rebut or impeach through presentation of Ritter's own opinion.
The State correctly cited case law for the long-held proposition that "objections not made are waived." Appellee's Brief at 45 (citing Tubbs v. State, 402 So.2d 830, 835 (Miss. 1981)). But procedural bar aside, Fox's "slip" should be deemed harmless since no evidence exists to show that the outcome of the case was affected. Hemphill v. State, 566 So.2d 207 (Miss. 1990).
In sum, this Court rejects Eula's contentions on both substantive and procedural grounds.

D. Issue No. 4

1.
The jury found Eula guilty of murder, after which she moved for a new trial on the basis that the verdict was against the overwhelming weight of the evidence. The trial judge denied the motion.

2.
Eula contends that the evidence overwhelmingly proves that she did not "appreciate the nature and quality of her actions due to a major state which dominated her mental condition for some four months preceding the fatal shooting." She rehashes some testimonial evidence  particularly the expert witnesses' evaluations of Eula's mental condition.
Eula also contends that the evidence "was insufficient to support a finding" that she "premeditatedly and deliberately designed the death" of Clara. In short, Eula went to Cleon's home that fateful day to kill herself or have Cleon kill her. She never intended to kill Clara; rather, the shooting was the consequence of her being frightened by Clara's screaming.

3.
The State first contends that the evidence clearly supports the conclusion that Eula "knew right from wrong and appreciated the nature and quality of her actions on the night in question." The State notes that all the experts agreed Eula was "depressed" at the time of the shooting; however, the experts also agreed she *1181 "was suffering from no defect in mind." Accordingly, the jury accepted the experts' opinions and found she was not "M'Naghten insane."
The State also contends that the evidence supports the jury's finding that Eula "premeditatedly and deliberately designed the death of Clara" and, thus, was guilty of murder (as opposed to manslaughter). The evidence clearly showed that Eula had threatened Clara's life on several occasions and that Eula had gone to Cleon's home with the intention to "shoot someone."

4.
Mississippi still applies the M'Naghten test for determination of insanity. Davis v. State, 551 So.2d 165, 173 (Miss. 1989).[1] This test requires that:
[t]o establish a defense on the ground of insanity, it must be clearly proved that at the time of committing of the act the accused was laboring under such defect of reason from disease of the mind as (1) not to know the nature and quality of the act he was doing, or (2) if he did know it, that he did not know that what he was doing was wrong.
Hunter v. State, 489 So.2d 1086, 1090 (Miss. 1986); Laney v. State, 486 So.2d 1242, 1245 (Miss. 1986). More succinctly, "the test for insanity is whether the defendant was unable to distinguish right from wrong at the time the act was committed." White v. State, 542 So.2d 250, 252 (Miss. 1989) (citing authoritative support).
"The defendant is presumed sane until a reasonable doubt of sanity is created." Davis, 551 So.2d at 173. If a reasonable doubt of sanity is created, the State bears the burden to prove sanity beyond a reasonable doubt. Billiot v. State, 454 So.2d 445, 463 (Miss. 1984), cert. denied, 469 U.S. 1230, 105 S.Ct. 1232, 84 L.Ed.2d 369 (1985).
The issue of insanity is for a jury to determine. Yarbrough v. State, 528 So.2d 1130, 1130 (Miss. 1988); Gerlach v. State, 466 So.2d 75, 79 (Miss. 1985). In making its determination, the jury may accept or reject expert and lay testimony. Gill v. State, 488 So.2d 801, 802 (Miss. 1986); Brady v. State, 425 So.2d 1347, 1349 (Miss. 1983). The jury's determination will remain undisturbed if it is supported by substantial evidence. Gerlach, 466 So.2d at 79. Restated, this Court should not reverse:
[u]nless convinced that the verdict is so contrary to the overwhelming weight of the evidence that, to allow it to stand, would be to sanction an unconscionable injustice. Pearson v. State, 428 So.2d 1361, 1364 (Miss. 1983). Any less stringent rule would denigrate the constitutional power and responsibility of the jury in our criminal justice system.
Groseclose v. State, 440 So.2d 297, 300 (Miss. 1983); See also Butler v. State, 544 So.2d 816, 819-20 (Miss. 1989); White, 542 So.2d at 252.
In the case sub judice, the jury assimilated the testimony and other evidence and determined that Eula was sane and guilty of murder. Perusal of the record, exhibits, briefs, and relevant law leads this Court to conclude: (1) that the jury's verdict is not contrary to the overwhelming weight of the evidence; (2) that Eula's contention is *1182 thus devoid of merit; and (3) that the verdict must remain undisturbed.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and SULLIVAN, ANDERSON, PITTMAN and BLASS, JJ., concur.
ROBERTSON, J., concurs by separate written opinion.
ROBERTSON, Justice, concurring:
I cannot for the life of me see the difference between allowing a witness, on the one hand, to testify that at a given point in time the defendant knew the difference between right and wrong and, on the other, allowing the same witness to testify that the defendant was "M'Naghten insane." These are but two ways of saying the same thing. M'Naghten insane is but a shorter label for the broader right and wrong test for insanity. If the one is allowed the other should be as well, see Rule 704, Miss. R.Ev., and for this reason, I have serious reservations about the majority's treatment of issue three, although I acknowledge the procedural deficiency there noted.
I have long been of the view that we should abolish insanity as a defense to a criminal charge and have set forth my reasons on several occasions. See Groseclose v. State, 440 So.2d 297, 302-06 (Miss. 1983) (Robertson, J., concurring); Laney v. State, 486 So.2d 1242, 1247 (Miss. 1986) (Robertson, Jr., concurring); Gill v. State, 488 So.2d 801, 809 (Miss. 1986) (Robertson, J., dissenting). I adhere to that view today and regard any error in rejecting Roundtree's proffered testimony through Dr. Robert Ritter legally harmless.
NOTES
[1] The M'Naghten test has been criticized by Justices Hawkins and Robertson. See, e.g., Gill v. State, 488 So.2d 801, 806-08 (Miss. 1986) (Hawkins, J., dissenting); Groseclose v. State, 440 So.2d 297, 302-06 (Miss. 1983) (Robertson, J., specially concurring). At the time Hawkins and Robertson expressed their opinion, the M'Naghten test was not popular among federal and state legislatures. In 1981, one published survey noted that "18 states (including Mississippi) cling to the unsullied M'Naghten Rule." Annotation, Modern Status of Test of Criminal Responsibility  State Cases 9 A.L.R.4th 526 (1981). This survey is now outmoded; the trend today reflects that most federal and state courts and legislatures have renounced their adherence to tests which are more liberal than the classic M'Naghten test. J. DRESSLER, UNDERSTANDING CRIMINAL LAW 297 (1986); see Schwartz, `Innocence'  A Dialogue with Professor Sundby, 41 HAST.L.J. 153 (1989) (WESTLAW, Hstlj Database, at 10) ("After brief judicial flirtations with the more liberal Model Penal Code formulation, California and federal legislators have reverted to M'Naghten Rules... ."); see also Entin, Psychiatry, Insanity, and the Death Penalty: A Note on Implementing Supreme Court Decisions, 79 J. CRIM. L. & CRIMINOLOGY 218, 222-23 (1988) (discussing the various tests  e.g., M'Naghten test, "irresistible impulse" test, "lack of control" test, "product" rule, and "substantial capacity" test).