ROBERTS, J.,
for the Court:
¶ 1. More than twenty years after the murder of W.D. Sanders (W.D.) and Elma Sanders (Elma), their grandson Keir Sanders (Sanders) was arrested and indicted for their murders. He was tried by the Circuit Court of Tishomingo County sitting, on a change of venue, in Lee County. Sanders was found not guilty of murder by reason of insanity on Count I, but the jury found that he remained insane and a danger to the community. On Count II, Sanders was found guilty of murder, and he was sentenced to life in prison as a habitual offender. The circuit court ordered him to be confined to the Mississippi State Hospital at Whitfield on Count I, and sentenced him to life in prison on Count II, with the confinement pursuant to Count I to be suspended until such time as Sanders is released on Count II. Sanders appeals his conviction and sentence, presenting four issues on appeal:
I. The verdict is against the overwhelming weight of the evidence, and it was error for the circuit court to deny Sanders’s motion for a new trial.
II. The circuit court erred in giving the State’s jury instruction on flight when the defense presented an independent reason for Sanders’s flight.
III. The circuit court erred by admitting gruesome autopsy photographs of the victims into evidence.
IV. The circuit court erred by requiring Sanders to serve the life sentence pursuant to Count II before being conveyed to the state mental hospital pursuant to Count I.
Finding no merit to the issues Sanders raises on appeal, we affirm his conviction and sentence.
FACTS AND PROCEDURAL HISTORY
¶ 2. On the morning of December 29, 1985, W.D. and Elma Crawford were attacked in their home in Tishomingo County. While W.D. was cooking breakfast, someone shot him in the back with a shotgun and then killed him by bludgeoning him in the back of the head with a hammer. After killing W.D., the attacker proceeded to the bedroom and shot Elma with a shotgun while she was lying in bed. The attacker fled the scene in the couple’s car.
¶ 3. Later that night, Officer Mike Kemp, chief deputy with the Tishomingo County Sheriffs Department in 1985, responded to a call concerning W.D. and Elma. Jannie Hadley (Jannie), daughter of the couple, had called Tennessee authorities to say that she could not reach her parents. This was reported to Officer Kemp, who went to investigate with auxiliary deputy David Johnson.
¶ 4. Upon arriving, Officer Kemp discovered that the door was ajar, and he heard a voice coming from inside. Inside the house, he discovered Elma lying on the couch, covered in blood. According to Officer Kemp, Elma told him that her grandson, Sanders, shot her and W.D. She did not know where Sanders was. Officer Kemp discovered that the phone had been pulled from the wall, so he returned to his squad car to call for backup.
¶ 5. Authorities searched the scene and discovered that Elma had been shot in the bedroom. After Sanders shot her, she crawled down a small flight of steps and wrote “K D shotgun” on the floor using *557 her own blood. W.D. was found face down on the floor of the kitchen. The hammer that Sanders used to beat him was found in a trash can in the house. Neither the shotgun nor the couple’s car was found at the scene.
¶ 6. Elma was taken to the hospital, where she spent several weeks in the intensive care unit. According to Sandra Puckett, who was the ICU supervisor and staff nurse at Iuka Hospital in 1985, Elma suffered a shotgun blast to her breast and right upper abdomen. Puckett said that Elma was afraid that she would never go home and that Sanders would finish her off. During Elma’s stay in the hospital, she lost a lot of blood, and she suffered multiple infections. She died on March 4, 1986. Sanders was twenty-one years old at the time of the murders.
¶ 7. Authorities eventually located W.D.’s car parked in a motel parking lot in Memphis, Tennessee on January 6, 1986. However, no more was heard from Sanders until 2005. In December 2005, Officer Guillermo Cantu, Jr., with the San Antonio Police Department, apprehended Sanders in San Antonio, Texas, after observing his suspicious behavior. Officer Guillermo found that Sanders was carrying his birth certificate, and he arrested Sanders after discovering the outstanding warrants for murder in Mississippi. Mickey Baker, with the Mississippi Bureau of Investigation division of the Mississippi State Highway Patrol, traveled to San Antonio with a fingerprint card for Sanders. He discovered that Sanders had used six different aliases since 1990.
¶8. Sanders was transported back to Mississippi, and he was indicted by a grand jury in Tishomingo County for Count I, the murder of W.D., and Count II, the murder of Elma. Venue was changed from Tishomingo to Lafayette County. The trial resulted in a mistrial, and venue was changed to Lee County. In Sanders’s defense during the trial in Lee County, he presented the testimony of his mother, Jannie, and stepfather, Gerald Hadley (Gerald). He also called two experts to testify — Dr. John McCoy and Dr. Mark Webb.
¶ 9. Jannie testified concerning Sanders’s childhood. She said that Sanders was diagnosed with schizophrenia at the age of eight or nine, and he changed when he was a teenager. Noticeable changes included Sanders quitting school, refusing to look in mirrors, screaming, hearing things, and sitting by himself for hours. Sanders was sent away for treatment at the Redemption Ranch in Pikeville, Tennessee; however, he ran away and was expelled. Jannie said that Sanders would spin around in his room and beat his head against the wall. When he came home, he was worse; he could not use utensils, covered mirrors, and stayed all alone. In 1982, after a confrontation, Sanders was sent away to Mid-South Hospital in Memphis. He later went to a halfway house, but he was kicked out. Next, in 1984, Sanders was sent to the Mississippi State Hospital at Whitfield. However, he only stayed for a few weeks before he ran away from Whitfield and moved back with his grandparents.
¶ 10. Sanders was treated at Mid-South from November 19, 1982, until he was discharged in August 1988. Dr. McCoy was a clinical psychologist at Mid-South during this time, and he treated Sanders. He described Sanders as follows: “He was really, very sick. He was the most mentally ill of all the patients in the hospital. He came in reporting bizarre symptoms. He was the sickest one that had been in that hospital in a long time.” Dr. McCoy also described some of Sanders’s symptoms: changing the pitch of his voice, burning Bibles, waking up cursing *558 and fighting, talking to himself, covering or breaking mirrors, refusing to use toiletry articles except for toothpaste, sleeping on the top of the covers with his shoes on, slamming doors, jumping off of the roof and out of windows at the behest of voices, and attacking people. He also said Sanders was paranoid, disoriented as to the date and time, and had delusions of persecution.
¶ 11. Dr. McCoy diagnosed Sanders as suffering from a schizoaffective disorder. He described the disorder as a combination of schizophrenia and bipolar disorder. He said that such a person generally is socially incompetent, has no friends, and has delusions and auditory hallucinations. It was Dr. McCoy’s opinion that Sanders should never have been discharged from Mid-South. Dr. McCoy also interviewed Sanders on May 10, 2008. It was Dr. McCoy’s opinion that, at the time Sanders killed his grandparents, he was “laboring under a defect of reason from a disease of the mind.” Dr. McCoy believed that Sanders understood the nature and quality of his actions, but that Sanders did not know that what he did was wrong.
¶ 12. Dr. Webb, a physician specializing in psychiatry with the Mississippi Neurop-sychiatric Clinic in Jackson, evaluated Sanders on December 11, 2007, at the behest of the circuit court. Dr. Webb admitted that Sanders’s situation was a close call; nevertheless, he agreed that while Sanders understood the nature and quality of his actions, he did not know that his actions were wrong. Dr. Webb noted Sanders’s possible history of aggressive and manipulative behavior, but he characterized Sanders as more paranoid than aggressive.
¶ 13. Dr. William Lott, a clinical psychologist, conducted a court-ordered forensic evaluation of Sanders on March 24, 2007. Dr. Lott noted the extended periods of time that Sanders was able to successfully function in society while not on any medications, and he also noted that Sanders had been off of any medication for at least four years at the time of the examination. Dr. Lott testified that Sanders looked fine and that he did not appear to be psychotic. He also said that Sanders exhibited a normal to above-average intelligence. In reviewing Sanders’s history, Dr. Lott noted evidence of manipulative behavior and possible extensive drug use. Dr. Lott described Sanders as having a history of impulsive, aggressive behavior. He believed Sanders was spoiled as a result of a history of being indulged. Dr. Lott also noted that the reports of Dr. Mona Carlyle, who treated Sanders in and around the time he went to Mid-South and Whitfield, may have indicated that Sanders showed no signs of psychosis. However, Dr. Carlyle’s final report on Sanders from October 15, 1984, diagnoses atypical psychosis.
¶ 14. Dr. Lott concluded that Sanders did understand the nature and quality of his actions. He noted that both Dr. McCoy and Dr. Webb initially disagreed with this assessment. However, at trial, they amended their opinions to agree with Dr. Lott and find that Sanders did understand the nature and quality of his actions. Contrary to the other doctors’ assessments, Dr. Lott found that Sanders understood that what he did was wrong. According to Dr. Lott, Sanders’s behavior during the murders was not random or psychotic; it was well reasoned and well intended. Supporting his conclusion was the fact that Sanders unplugged the phone, wrapped the cord around it, and hid it under the sofa. Also, Sanders took his grandparents’ car and immediately fled to Memphis, hiding the car in a busy parking lot. Sanders then made the trip to Texas and successfully avoided capture by adopt *559 ing six different aliases over the next twenty years. Dr. Lott was suspicious that illegal drug use played a part in Sanders’s actions even though there was little or no evidence that Sanders used illegal drugs. Sanders did not testify in his own defense.
¶ 15. While deliberating, the jury sent out a note with questions for the circuit court. It read as follows:
What is the minimum sentence for someone that is found to be insane and a danger to the public?
If the defendant is found “not guilty” by reason of insanity BUT is a danger to the public ... [w]ill the defendant be allowed to ever walk as a free man on the street?
The circuit court did not answer the questions. The jury returned a verdict of not guilty on Count I, the murder of W.D., by reason of insanity and found that Sanders had not been restored to his sanity and was dangerous to the community. On Count II, the murder of Elma, the jury found Sanders guilty. The circuit court sentenced Sanders to life in prison as a habitual offender on Count II. On Count I, the court ordered Sanders to be confined to the state psychiatric hospital until such time as he is restored to his sanity, with Sanders’s confinement to be delayed until he served his life sentence on Count II. Sanders timely filed a motion for a judgment notwithstanding the verdict or, in the alternative, for a new trial, which the circuit court denied. Sanders then filed the present appeal.
DISCUSSION
I. The verdict is against the overwhelming weight of the evidence, and it was error for the circuit court to deny Sanders’s motion for a new trial.
¶ 16. In Sanders’s first allegation of error, he claims that his conviction of murder is against the overwhelming weight of the evidence and that the circuit court erred in denying his motion for a new trial. Sanders argues that the overwhelming weight of the evidence indicated that he was insane at the time he committed the murders.
¶ 17. We will initially speak to the inconsistent verdicts that the jury reached at the conclusion of Sanders’s trial. In his brief, Sanders notes the inconsistency in the jury’s verdicts, but he concedes that, taken on its own, the fact that the jury returned inconsistent verdicts is not sufficient to overturn his conviction. In Edwards v. State, 797 So.2d 1049, 1058 (¶ 25) (Miss.Ct.App.2001), this Court held that the fact that the defendant “was found not guilty by reason of insanity should not have an effect on this Court’s analysis of inconsistent verdicts.” In so holding, this Court noted various cases from other jurisdictions. In Ruiz v. State, 641 S.W.2d 364, 366 (Tex.App.1982), the Texas Court of Appeals affirmed the murder conviction of Jesus Nieto Ruiz despite the fact that he was found not guilty by reason of insanity on three other charges even though they were all committed within a short time of one other and were charged in the same indictment. The court in Ruiz stated that “[wjhere a multi-count verdict appears inconsistent, the appellate inquiry is limited to a determination of whether the evidence is legally sufficient to support the counts on which a conviction is returned. What the jury did with the remaining counts is immaterial.” Id. (citing United States v. Michel, 588 F.2d 986, 997 (5th Cir.1979)). Two years after Ruiz, the United States Supreme Court stated that “[cjonsistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment.” United States v. Powell, 469 U.S. 57, 62, *560 105 S.Ct. 471, 83 L.Ed.2d 461 (1984) (citation omitted).
¶ 18. Addressing the same issue, the Appeals Court of Massachusetts upheld the conviction of unlawfully carrying a firearm of a man who was also found not guilty of murder by reason of insanity. Commonwealth v. Chandler, 29 Mass.App. Ct. 571, 563 N.E.2d 235 (1990). The Appeals Court of Massachusetts reasoned that “[t]he fact that the verdicts might be factually inconsistent is of no avail to the defendant. It is well settled that ‘factual inconsistencies in verdicts rendered in the same case do not afford a ground for setting aside the conviction.’ ” Id. at 241 (quoting Commonwealth v. Harrison, 25 Mass.App.Ct. 267, 517 N.E.2d 494, 495 (1988)).
¶ 19. During deliberations in the case sub judice, the jury asked: (1) “What is the minimum sentence for someone that is found to be insane and a danger to the public?” and (2) “If the defendant is found “not guilty” by reason of insanity BUT is a danger to the public ... [w]ill the defendant be allowed to ever walk as a free man.” The jury’s questions and subsequent verdict do not indicate whether the jury was ever inclined to find Sanders legally insane for Elma’s murder. Perhaps the jury merely had a reasonable doubt about Sanders’s sanity at the time he shot W.D.,- his grandfather, because of the long-standing animosity and possible paranoia toward W.D., but the jury worried that Sanders would somehow be released if it were to find him not guilty by reason of insanity. Although it is quite plausible that the jury never questioned Sanders’s sanity at the point he decided to shoot Elma, we all indulge in speculation when we try to determine the collective mind of a jury.
¶ 20. As noted by the United States Supreme Court:
The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant’s guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity.
Powell, 469 U.S. at 63,105 S.Ct. 471 (internal citations and quotations omitted) (emphasis added). The Court went on to state that to allow criminals to challenge inconsistent verdicts on the ground that in their case the verdict was hot the product of lenity would require inquiries into the jury’s deliberations, and courts generally will- not undertake such a task. Id. at 67, 105 S.Ct. 471. Likewise, this Court should not be swayed by a seemingly inconsistent verdict in the instant case and indulge in speculation.
¶ 21. If Sanders had been tried separately in Lafayette County for the murder of his grandfather and found not guilty by reason of insanity and months later tried in Lee County for the murder of his grandmother, based on the same evidence, and found guilty of murder, the “not guilty” verdict in Lafayette County would have no relevance or materiality to the guilty verdict in Lee County. There would be no res judicata or collateral estoppel principle involved. Both the legal sufficiency or the weight of the evidence must be judged solely on the evidence the jury had before it when the jury members shut the door to the jury room and began their final deliberations. The sufficiency or weight of the evidence cannot be based on an event, such as an inconsistent verdict, which transpires thereafter.
¶ 22. When analyzing the weight of the evidence that supports a jury’s verdict, we are simply prohibited from considering, in *561 any way, what the jury did on another count. It is irrelevant and immaterial. It is as if it never happened. With this standard in mind, and in total disregard to the verdict in Count I, it is incumbent upon us to determine whether the verdict is against the weight of the evidence in Count II— Sanders’s murder of his grandmother. We find nothing in the present case that warrants a departure from our previous holding on this issue in Edwards. Accordingly, we will review Sanders’s conviction solely to determine whether it is supported by the weight of the evidence.
1123. When this Court is asked to review the denial of a motion for a new trial based on the weight of the evidence, we review the evidence in the light most favorable to the verdict. Bush v. State, 895 So.2d 836, 844 (¶ 18) (Miss.2005). Specifically, the supreme court stated:
When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. We have stated that on a motion for new trial,
[the appellate court] sits as a thirteenth juror. The motion, however, is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.
However, the evidence should be weighed in the light most favorable to the verdict. A reversal on the grounds that the verdict was against the overwhelming weight of the evidence, unlike a reversal based on insufficient evidence, does not mean that acquittal was the only proper verdict. Rather, as the “thirteenth juror,” the court simply disagrees with the jury’s resolution of the conflicting testimony. This difference of opinion does not signify acquittal any more than a disagreement among the jurors themselves. Instead, the proper remedy is to grant a new trial.
(Internal citations and quotations omitted). After a thorough and contemplative review of the record in the light most favorable to the verdict, we find that the evidence does not preponderate heavily against the verdict, nor would it sanction an unconscionable injustice to allow the verdict to stand.
¶24. Mississippi relies on the M’Naughten Rule to determine legal insanity. Stamper v. State, 803 So.2d 1194, 1197 (¶ 7) (Miss.2000) (citation omitted). Under the M’Naughten Rule, a defendant may not be held criminally liable for his actions at the time of the alleged crime if he “was laboring under such a defect of reason from disease of the mind that either (a) he did not understand the nature and quality of his act, or (b) if he did understand the nature and quality of his act, he did not appreciate that the act was wrong.” Id. (citing Roundtree v. State, 568 So.2d 1173, 1181 (Miss.1990)). Whether the defendant was insane at the time of the alleged crime is an issue for the jury, which “may accept or reject expert and lay testimony.” Crawford v. State, 787 So.2d 1236, 1243 (1129) (Miss.2001) (quoting Tyler v. State, 618 So.2d 1306, 1309 (Miss.1993)). “A defendant is presumed sane until a reasonable doubt of sanity is created.” Hearn v. State, 3 So.3d 722, 738 (¶ 47) (Miss.2008) (citing Roundtree, 568 So.2d at 1181). “Once a reasonable doubt of sanity is raised, the State bears the burden to prove the defendant’s sanity beyond a reasonable doubt.” Id. The supreme court has recognized that “institutional and practical con *562 siderations mandate that in insanity defense cases, perhaps more than any other, a jury’s verdict ought to be given great respect and deference.” Crawford, 787 So.2d at 1243 (¶ 29) (quoting Groseclose v. State, 440 So.2d 297, 301 (Miss.1983)).
¶ 25. Undoubtedly, Sanders suffered from emotional and/or psychological problems as well as self-reported drug use. However, the various testimonies by medical personnel, who had either treated or evaluated Sanders at various times prior to and twenty years after the murders of Sanders’s grandparents, along with the lay testimonies presented by Sanders’s mother and stepfather about the long-standing animosity, between Sanders and his grandfather, presented the jury with conflicting accounts of the degree or severity of Sanders’s mental illness. The jury was well within its discretion to determine that, whereas Sanders may have been overcome by paranoia when he brutally bludgeoned and shot his grandfather, while his grandfather was cooking breakfast that morning, he was deliberate and cognizant of the wrong that he was committing when he then went upstairs to shoot his sleeping grandmother.
¶ 26. Testimony established that Sanders had a history of arguing with and violence against his grandfather, but testimony did not establish that he showed such aggression toward Elma, his grandmother. Also, testimony established that Sanders deliberately and methodically unplugged the telephone to impede someone from acquiring help; he stole his grandparents’ car; and he hid the car in a hotel parking lot where it would be just one more unsuspicious car among many. He then managed to abscond to Texas and elude Mississippi authorities for twenty years, in spite of a widespread search including coverage on the television shows “America’s Most Wanted” and “Unsolved Mysteries.” He also managed to conceal his true identity and the murder of his grandparents in spite of a one-year period of incarceration and a ten-year period of supervision in Texas by utilizing six different aliases.[1] Sitting as a hypothetical thirteenth juror, we will review crucial parts of the testimonies presented at trial below to illustrate that the evidence did not preponderate. heavily against the jury’s verdict.

a. Elma Crawford

¶ 27. Elma’s account of what happened was presented as a dying declaration under Mississippi Rule of Civil Procedure 804(b)(2) and as a present-sense impression under Mississippi Rule of Civil Procedure 803(1) via the testimonies of Officer Mike Kemp, who found Elma and W.D. shot inside their home, and Puckett, a *563 nurse and the supervisor of the intensive care unit where Puckett cared for Elma during her last days after being shot by Sanders. It is unquestioned that Sanders shot Elma and W.D. The first thing Elma told Officer Kemp when he arrived at her home was “K.D. shot me.” She told Officer Kemp that after being shot, she crawled downstairs, but she could not find the telephone to call for help because Sanders had pulled it from the wall. Thinking that she would die and wanting whoever found them to know who had killed them, she scrawled “K.D. shotgun” in her own blood in the hallway leading to the stairwell.
¶ 28. Puckett testified that Elma spoke with her numerous times about the incident, and that Elma thought she would never be able to leave the hospital. Elma was very afraid that Sanders would return to the hospital to complete the task of killing her. She specifically stated to Puckett: “I know that [Sanders] will come back and finish me off.” Puckett testified that, because of Elma’s great fear of Sanders, she and other medical personnel stayed with Elma during the night, and they even arranged the room’s furniture around the door so that they could hear someone entering the room.
¶ 29. Elma also told Puckett about the events that had led up to Sanders shooting his grandparents. Elma stated that she awoke to Sanders and W.D. arguing in the kitchen because W.D. would not let Sanders use the car. So, she got out of bed, and she saw Sanders hitting W.D. with a hammer. She then heard a gunshot, so she got back into bed presumably thinking that Sanders would not harm her if she was asleep. However, Sanders went upstairs and shot Elma in the chest. At some point during this violence, Sanders unplugged the telephone, methodically wrapped the cord around it, and then hid it under a sofa before leaving in his grandparents’ vehicle.

b. Officer Mike Kemp

¶ 80. Officer Kemp was the officer who responded to the Crawfords’s residence after Sanders’s mother, Jannie, contacted the police because she wanted the police to check on her parents. Jannie told the police that Sanders was staying with her parents; she had not been able to reach them; and “she had a bad feeling and thought that [Sanders] might have harmed them.” In addition to the facts already stated above, Officer Kemp testified on cross-examination that he had been called to the Crawfords’s home approximately two weeks before the murders occurred. W.D. advised Officer Kemp that: he was afraid of Sanders; Sanders had a temper; and Sanders could not control his temper. However, Officer Kemp testified that W.D. did not tell him that Sanders was paranoid. Kemp stated that he advised W.D. to contact the chancery clerk’s office in order to seek assistance. Returning to the events immediately following the shootings, Officer Kemp, along with Officers Joe McFer-rin, Kevin Booker, and Bob Payne, testified that the grandparent’s car was found several days after the shootings in the parking lot of a Holiday Inn in Memphis, Tennessee. The shotgun Sanders had used to shoot his grandparents was never found, and as stated above, Sanders, through the use of aliases, eluded the police for another twenty years.
c. Jannie Hadley
¶ 31. Jannie, Sanders’s mother, testified, during cross-examination, that Sanders was a bright child, but he began to change dramatically when he was a teenager. She acknowledged that this was also about the time that she married for the third time; Sanders was moved from Mississippi to Tennessee; and Sanders was displaced from the private school that *564 he had been attending and enrolled in a public school. Obviously, there were many changes occurring in Sanders’s life during that time. Sanders’s behavior during his middle-teen years also resulted in him being placed in a facility called Redemption Ranch, which is a type of private reform school for wayward or troubled youth. When discussing the time surrounding Sanders’s stint at Redemption Ranch, Jannie testified that Sanders was not mean to those at the reform school, and he did not “raise his hand to [her].” She also stated that Sanders never tried to hurt her, but he often screamed at and argued with her. Jannie also testified that Sanders seemed mad all of the time.
¶ 32. Sanders was hospitalized at Mid-South and Whitfield after physical altercations with his grandfather.[2] Sanders spent nine months at Mid-South, but he was discharged when his family’s insui'ance benefits ran out. Later after another attack upon W.D., Sanders was placed at Whitfield for a period of thirty days, but he ran away from there prior to the completion of the full thirty days. He was not returned to Whitfield, and testimony established that Sanders had made “a deal” with Elma that if she would not make him go back, he would go and be with Elma and W.D. at their home on Pickwick Lake.
¶ 33. Jannie testified that, off and on throughout these years, Sanders had a dirty room and appearance, would talk to himself, exhibited a great deal of animosity toward her, and threw many temper tantrums. Testimony by Jannie and others demonstrated that, for some reason, Sanders became physical toward W.D., but not other family members. Upon questioning about Sanders’s violence toward his grandfather, Jannie testified that “[W.D.] would come up, and he would have a black eye or bruises on his face.” This was corroborated by Gerald, Jannie’s husband and Sanders’s stepfather. And, as stated, Sanders’s aggression toward W.D. was part of the motivation for having him committed to Mid-South and Whitfield.

d. Gerald Hadley

¶ 34. Gerald was a long-time friend of W.D. before he met and later married Jannie. Along with Jannie’s testimony that Sanders was doted on by Jannie and her parents, Gerald testified that Sanders was a “spoiled child,” and Sanders stayed with Elma and W.D. more than he did with Jannie and Gerald because Gerald’s home was more strict than Sanders’s grandparents’ home. Notably, testimony established that Sanders was able to abide by Gerald’s rules when he was in Gerald’s home, and Sanders did not exhibit disrespectful behavior toward Gerald like he did his mother and grandfather. Because of Sanders’s time spent in hospitals and with his grandparents, Gerald testified that he and Jannie had little contact with Sanders between 1982-1985, the years immediately prior to the shootings.

e. Dr. John McCoy

¶ 35. Dr. McCoy was a clinical psychologist at Mid-South when Sanders was a patient there. The defense called Dr. McCoy and another psychologist from Mid-South, Dr. John Ciocci. Dr. McCoy had seen and treated Sanders for nine months approximately two years before the murders. However, because the defense had acquired the testimony of the two medical personnel only about a week before trial and also had violated discovery rules, the circuit court only allowed Dr. *565 McCoy to testify, stating that Dr. Ciocci’s testimony would be cumulative.[3]
¶ 36. Although, Dr. McCoy had not seen or treated Sanders for more than twenty years at the time of trial, he testified that he clearly remembered Sanders because “[Sanders] was the most mentally-ill patient in the hospital.” He went on to state that “[Sanders] was dangerous.... [And, that] [everybody knew that [Sanders] was severely disturbed.” It was during his time at Mid-South that Sanders was diagnosed with schizoaffective disorder.
¶ 37. Despite Dr. McCoy’s testimony about the severity of Sanders’s mental condition, during cross-examination, Dr. McCoy admitted that much of what he had stated about Sanders’s condition during direct examination was not reflected in Sanders’s medical records. Rather, Dr. McCoy stated that he was simply remembering it from twenty years earlier.
¶ 38. Dr. McCoy examined Sanders on May 10, 2008, while Sanders was in jail after being apprehended in Texas and extradited to Mississippi. Dr. McCoy stated that he found Sanders to be “largely, largely credible” during the interview in 2008. During that interview, Sanders told Dr. McCoy that he was not hallucinating at the time of the murders, and he did not believe his grandparents were possessed. However, Sanders did tell Dr. McCoy that he thought his grandparents were evil. Despite Dr. McCoy finding Sanders to be “largely, largely credible” and acknowledging that Sanders had not definitively stated that he heard voices at the time of the shootings, Dr. McCoy determined that Sanders probably was not remembering the events correctly. The record reflects that Dr. McCoy believed that Sanders was hearing voices at the time of the shootings because hearing voices was part of schizophrenia or schizoaffective disorder. Dr. McCoy explained that it was like a doctor diagnosing pneumonia but not specifically diagnosing fever because the two are so interrelated.
¶ 39. Also, despite Sanders’s account that he was not hallucinating at the time of the murders, Dr. McCoy testified that Sanders thought people were going to kill him, so he would not eat. Dr. McCoy went on to opine that he thought that Sanders “stayed up all night [the night before the murders] because he was afraid that he was going to get killed.” It is noteworthy that Dr. McCoy did not testify that Sanders specifically told him he stayed up all night because he was fearful of being killed, nor does he discuss or address the fact that Sanders killed W.D. in the midst of a heated argument when W.D. refused to let Sanders have his way and take the car.
¶ 40. Dr. McCoy admitted during cross-examination that: he did not know what Sanders was thinking at the time that he killed his grandparents; it happened a long time ago; and there was not much evidence and no professional report about what Sanders was thinking right before or right after the crime. He conceded that he only had nine pages of medical records from Sanders’s time at Mid-South; he had not seen Sanders for nearly two years prior to the murders; and much of what he was testifying about was from his twenty-two-year-old memories. In response to questions about the M’Naughten standard *566 that must be overcome to establish that a defendant was legally insane at the time of the trial, Dr. McCoy acknowledged that it was very hard to determine the answer about that. Yet, he still maintained that he and Dr. Ciocci knew the most about Sanders because they had treated him for nearly nine months two years prior to the shootings, and Dr. McCoy maintained that whereas Sanders knew the qualities of his actions, he did not know that they were wrong.[4]

f. Dr. Mark Webb

¶ 41. Dr. Mark Webb stated that he “was appointed by the [circuit] court[ ] or was asked by an attorney” to evaluate Sanders, and he interviewed Sanders, for the first time, on December 11, 2007. Relying in part upon Dr. McCoy’s evaluation, Dr. Webb initially found that Sanders did not know the nature and quality of his actions at the time of the murders. However, he changed his opinion during the trial after hearing the testimony of Dr. McCoy and the other witnesses. He, too, maintained that he thought that Sanders did not know his actions were wrong at the time of the murders. Dr. Webb testified that all of the medical professionals, including the State’s expert, Dr. Chriss Lott, thought that Sanders was dangerous. Although Dr. Webb, like Dr. McCoy, gave a great deal of testimony, we will only emphasize a few crucial points that support the jury’s finding that Sanders may have been acting on his paranoia associated with his mental illness when he shot W.D., but that he was under no such delusion at the time he shot Elma, thereby attempting to eliminate the only witness to his murder of W.D.
¶ 42. During cross-examination, Dr. Webb was questioned about some of Sanders’s medical records written by Dr. Mona Carlyle on November 8, 1983, when Sanders was admitted to Whitfield. Dr. Carlyle’s notes stated that:
there appeared] to be more hostility, anger, frustration[,] and boredom than depression, although depression will certainly be the end result if no other outlet is found for these emotions. I could find nothing at this time either from interviewing [Sanders] or the grandparents that even approached the concept of manic behavior now or at any time in the past.
Dr. Carlyle went on to state:
From the moment the grandparents entered the room, [Sanders] changed from an intelligent, interesting' person, who appeared to be doing his best to conduct a reasonably honest interview, in spite of a few faking good[-]type responses.... He became extremely defensive, with very good reason. He came under very heavy, critical attack from the grandfather. If the grandmother agreed, she would verbally back up her husband. If she disagreed, she would shake her head behind his back. But neither the grandfather nor [Sanders] were aware of when she felt [Sanders] was correct. In other words, she would verbalize criticism of [Sanders], but never support.
Further, Dr. Carlyle noted that “there [was] always conflict between the two men.” Dr. Carlyle, who examined Sanders closest to the time of the murders, stated that “[Sanders] has a reasonable level of *567 intelligence. He does not appear psychotic. As far as I know, at the moment[,] he never has overtly been psychotic. However, [Sanders] is exceedingly immature. He’s very deficient in judgment.”
¶ 48. After discussing Dr. Carlyle’s report about Sanders, Dr. Webb described the relationship between Sanders and his grandparents as a “love-hate relationship.” Dr. Webb stated that “[h]e obviously loved to be around them [and] kept wanting to come back to them, but there was a lot of conflict with [his] grandfather. [There were] [flights, broken noses, hostility, [and] black eyes.”
¶ 44. In response to the State’s remark that Sanders exhibited antisocial behavior toward the grandfather, Dr. Webb responded that:
[He] wouldn’t agree that they’re antisocial. They’re aggressive. If [Sanders] wasn’t manic depressive or schizophrenic, you could say [he was] antisocial. In some instances it was like he was antisocial. But I felt like this was more paranoia. He had this paranoid situation with his grandfather, and was going to strike him before he got struck by his grandfather.
¶ 45. After being asked about Sanders’s methodical concealment of the telephone and flight to Texas, the following colloquy between Dr. Webb and the State transpired:
A. He’s fleeing from everybody.
Q. From everybody. But you just said that the thing that made you think that he didn’t know the wrongfulness of his act was because of his distinct hatred for his grandfather.
A. That and everybody. I mean his grandfather was top of the list. He hated everybody, and he felt they hated him.
Q. All indications, if you look at it from my perspective, [are] of [Sanders] being aware of his wrongful conduct, isn’t it?
A. I understand you’re saying that, but I disagree. I think that he is not aware. I think he is so delusional and goes and lives on the street for decades.
Q. But it’s only after he kills them that he does all these things that ... indicate] ... he knew he had done ... wrong[,] and [he was] not ... found at the scene of the murders. Isn’t that correct?
A. No. That’s a possibility, again with his preexisting history and his longstanding predisposed history. I don’t think that’s the best explanation for his behavior.
On redirect, the following question and answer were presented:
Q. And as far as these threats that you were asked about from his grandfather, again, it may seem totally irrationality and unbelievable to us that his grandfather was a threat to his health and well-being, but it doesn’t matter what normal people think, does it?
A. No. You’ll see this in paranoids. They’ll get — you read about this in the paper. Just these paranoid people erupt sometimes. There’s this one person, not stalking, but they get this one person in their focus, and that seems to be their point of paranoia.
(Emphasis added).
¶ 46. Dr. Webb went on to agree that: Sanders had a manipulative nature; he had not wanted to be at Mid-South or Whitfield; and he was angry about being there and was extremely aggressive. It is *568 clear from the witnesses presented by the defense that Sanders, whether he was legally insane or not, was an angry young man who had contempt for his grandfather. From a thorough reading of the record, there was ample evidence presented to the jury such that a reasonable juror could have concluded that Sanders “erupted” during yet another argument between him and his grandfather, but that his violent actions toward his grandmother were for the purpose of concealing his crime against his grandfather, not solely because he was paranoid or delusional.

g. Dr. William Lott

¶ 47. Dr. Lott, a forensic psychologist, evaluated Sanders on March 24, 2007, at the behest of the State.[5] Sanders was not on medicine for schizophrenia or schizoaf-fective disorder at the time of Dr. Lott’s interview, and there was no record that he had been on medicine for treatment of his mental illness for decades. Dr. Lott did not find Sanders to be psychotic at the time of the interview. Dr. Lott also performed a Global Functioning Assessment Test (GAF) on which Sanders scored a 71. Before Lott’s testimony, Dr. Webb had testified that this was a “pretty good” score and indicated that Sanders would have been doing fairly well at that time. Dr. Webb had also performed a GAF test on Sanders after Sanders had been placed on medication while in jail, and Sanders scored a 75. Testimony established that the GAF tests performed eighteen months apart indicated that Sanders exhibited nearly the same functioning level whether on or off medication.
¶ 48. Furthermore, Dr. Lott testified that, at the time of his evaluation, Sanders looked fine, exhibited no indication of any impairment, was very pleasant and cooperative, and subdued. Dr. Lott stated that there was nothing during the interview that would suggest that “there was any kind of a problem whatsoever.” He went on to state that at the time of the interview, Sanders “was not mentally ill, and that’s the problem [he] ha[d] with the case. If [Sanders] was severely and chronically mentally ill, then one would expect him to have been suffering, without medication, significant symptoms. And[,] he was not, and apparently [he] had not been for some time.” Dr. McCoy and Dr. Webb acknowledged that a person like Sanders should not have just improved without treatment or medication, if he or she were as sick as Dr. McCoy stated Sanders was in 1983.
¶ 49. On cross-examination, Dr. Lott acknowledged that, in his report, he stated that “up to the time ... of the[ ] killings on December 29th of 1985, [Sanders] was very sick and severely mentally ill,” but he and all of the medical professionals testified that symptoms of schizophrenia or schizoaffective disorder can “wax and wane” so diagnosed persons have periods of lucidity and know right from wrong. Also, Dr. Lott testified again that Sanders *569 exhibited no psychosis when Dr. Lott interviewed him. A pivotal difference among Dr. Lott, Dr. McCoy, and Dr. Webb was that, unlike Dr. McCoy and Dr. Webb, Dr. Lott considered the possibility that Sanders’s mental illness or behavior prior to the shootings may have been caused or exacerbated by his illegal drug usage. Furthermore, the State questioned the witnesses extensively about Sanders’s reported illegal drug use, and the voluminous record supports Dr. Lott’s opinion that Sanders had used drugs, and they may have affected his mental well-being.
¶ 50. Sanders, both before and after the murders, repeatedly reported to medical personnel that he used illegal drugs. Sanders confessed to using copious amounts of illegal drugs — marijuana, quaa-ludes, and cocaine to name a few.[6] He also reported alcohol abuse. Sanders’s cousin, Brian Crawford, testified that he heard from his and Sanders’s family that Sanders used illegal drugs. Additionally, on Sanders’s intake form at Mid-South, Elma stated that “she felt that [Sanders] was neglected and that [his] mother [had] left him when he needed her the most.” The intake form went on to indicate that Elma had stated that “the mother reportedly lived a very secretive life until she remarried and lived in Selmer, Tennessee. The grandmother sees this as the time [Sanders] turned to drugs.” (Emphasis added). The intake report from Mid-South also stated that “[a]ccording to the grandmother, the stepfather drinks heavily and is abusive and has a son who is a bad influence on [Sanders].”
¶ 51. Somewhat reluctantly, Dr. McCoy and Dr. Webb acknowledged that it was possible that Sanders “dabbled” in illegal drugs. However, they were both adamant that the drug use was not the cause of Sanders’s mental illness. Dr. McCoy testified that Sanders should have greatly improved during the nine months he was in Mid-South, if his problems were caused by drugs. Also, in an effort to explain why drugs could not have been the cause of Sanders’s problems, Dr. McCoy opined that Sanders’s self-reported drug use was not likely because he was “antisocial.” Therefore, Sanders would not have gotten close to drug dealers, which would have been necessary for him to attain drugs. Dr. McCoy’s theory or opinion as to Sanders’s lack of ability to purchase drugs is unpersuasive. It was clearly established at trial that Sanders had at least $200 per month at his disposal, and that amount does not reflect any monies that his doting parents or grandparents may have given him. The record reflects that Sanders had ample opportunity to acquire the drugs that he reported he used. It was clearly presented to the jury that family members, as well as Sanders, acknowledged that Sanders may have had a drug problem.
¶ 52. Although the reports of Sanders’s drug usage is given short shrift by both parties, we are compelled to note the following:
*570 Mississippi law recognizes a distinction between an insanity defense and the situation where a defendant’s reason is suspended because he has voluntarily impaired his mental functions through the use of alcohol or drugs.... [T]he clear rule of this State has been that “voluntary intoxication by a defendant should not be permitted as a defense if a defendant, when sober, is capable of distinguishing between right and wrong, and the defendant voluntarily deprives himself of reason by intoxication, and commits an offense while in that condition.”
Stamper, 803 So.2d at 1197 (¶ 8) (quoting McDaniel v. State, 356 So.2d 1151, 1156 (Miss.1978) (Sugg, J., specially concurring joined by majority of participating justices)). The record supports the testimony presented by Dr. Lott, and the jury would have been well within its discretion to consider the influence illegal drugs may have had on Sanders’s behavior or illness.
¶ 53. Sanders relies upon several cases to support his argument that he should receive a new trial because the verdict is against the overwhelming weight of the evidence, and one of them is Hawthorne v. State, 883 So.2d 86 (Miss.2004). In Hawthorne, Curtis Hawthorne pled an insanity defense following an indictment for manslaughter after he negligently ran through an intersection with his car killing Jeffrey McGrew. Id. at 87-88 (¶¶ 1, 4). Testimony was given that: Hawthorne thought he was hearing messages from God and the devil; he believed that he was on a mission to take a cross to his daughter in order to cure his wife’s cancer; and he did not need to stop at intersections because his vehicle would just pass through obstacles. Id. at 88 (¶¶ 3, 4). The jury did not find Hawthorne to be legally insane, and he was sentenced to fifteen years in prison with seven of those years suspended. Id. at (¶ 6). On appeal, this Court reversed and rendered finding that the State had failed to present sufficient evidence to support Hawthorne’s conviction. Id. at (¶ 7). The supreme court granted the State’s writ of certiorari, and determined that the sole issue for the jury was whether Hawthorne knew right from wrong at the time of the crime. The supreme court determined that there was sufficient evidence that Hawthorne did know right from wrong at the time of the accident because eyewitnesses testified that, after the accident, Hawthorne looked around and then ran from the scene. Id. at 89-90 (¶ 10). Despite finding that the evidence was legally sufficient, the supreme court considered testimony about Hawthorne’s actions days before the accident and eyewitness testimony immediately after the accident, and the court determined that the verdict was against the overwhelming weight of the evidence and remanded the case for a new trial. Id. at 90 (¶¶ 11,12).
¶ 54. Although Hawthorne is analogous to cases involving insanity defenses, there are crucial differences between it and the instant case. In Hawthorne, there was eyewitness testimony about Hawthorne’s bizarre behavior immediately before and within the days preceding the accident; it was described as follows:
The defense put forth evidence showing Hawthorne’s behavior days before this wreck. Hawthorne began to hear what he believed to be the voice of God or the Devil. He also began to believe that he was in Hell, that the day of judgment was at hand, that the television was sending messages to him from God or the Devil, that he was going back in time, and that the presidential election of 2000 was being held specifically for him. Hawthorne was observed walking around in a trance and praying in the rain for hours. After experiencing these feelings, Hawthorne believed that he *571 had to go home to Virginia in order to deliver a cross to his daughter, cure his wife’s cancer, and be home before the world came to an end. It was also shown that mental problems such as schizophrenia ran in his family and several family members suffered from this disease.
Id. at (¶ 11). Testimony about the days preceding the shootings in the instant case are dissimilar.
¶ 55. Sanders shot Elma and W.D. on December 29, 1985, and testimony by his mother, Jannie, established that Sanders had spent Christmas alone, while Elma and W.D. went to her home in McNairy County, Tennessee. Jannie testified that Sanders did fine taking care of himself, but he had left “a mess” for Elma to clean up. Additionally, she stated that Sanders frequently stayed by himself while his grandparents would go and spend a week at a time with her in Tennessee. The record is not clear about what day Elma and W.D. returned home that Christmas, but it is clear that, unlike Hawthorne, there were no eyewitnesses to Sanders’s behavior in the days or hours immediately preceding Sanders’s attack on his grandparents, other than his grandparents.
¶ 56. In Hawthorne, the supreme court also discussed Hawthorne’s actions immediately after the accident, and stated:
The fact that Hawthorne ran from the scene was also rebutted by the defense. According to the defense, Hawthorne ran from the scene because he was still under the delusion that he had to get back to Virginia to cure his wife, deliver the cross to his daughter, and be home when the world ended. The police officer who ran after Hawthorne testified that Hawthorne was sweating profusely and was mumbling. Hawthorne’s behavior was so erratic that the police believed Hawthorne was on drugs. This erratic behavior continued throughout the questioning. One detective testified that Hawthorne would laugh one moment and cry the next and continued to say that his father was killed when in fact he was still alive. The detective stopped questioning Hawthorne because of this erratic behavior. In addition to this, the defense produced four medical experts who testified that Hawthorne was unable to appreciate the difference between right and wrong.
Id. at (¶ 12). Although defense witnesses Dr. McCoy and Dr. Webb speculated about such delusional behavior by Sanders, there was no eyewitness testimony presented that could substantiate their theories as there was in Hawthorne.
¶ 57. Opposite from Hawthorne, Sanders managed to conceal his crime and disappear for twenty years, so no one witnessed any erratic behavior by Sanders. Also, unlike Hawthorne, Sanders did not harm someone based solely upon a delusion. Rather, Elma’s account indicates that he exploded in a fit of rage after being denied access to his grandparent’s vehicle. Moreover, it is to be remembered, Dr. McCoy testified that Sanders told him that he was not hallucinating at the time he shot his grandparents, nor did he think that his grandparents were possessed.
¶ 58. In Hawthorne, another crucial fact that supported the supreme court’s decision to remand for a new trial was the absence of credible testimony to rebut Hawthorne’s insanity defense and prove beyond a reasonable doubt that Hawthorne was sane at the time of the accident. Id. at (¶ 13). In Hawthorne, the supreme court went on to state that the “record ... lack[ed] substantial credible evidence suggesting that at the time in question, Hawthorne was sane in the M’Naughten sense.” Id. As illustrated above, the record in the instant case is *572 replete with credible evidence from which a jury could have concluded that Sanders was not legally insane at the time he shot Elma.
¶ 59. Sanders also relies upon Holloway v. State, 312 So.2d 700, 702 (Miss.1975). Lester Holloway’s extended confinement, which was for ten years following the crime, was found to be a factor the supreme court considered. Id. However, the supreme court also stated that such confinement (which was far lengthier than Sanders) was not conclusive of insanity. Id. Holloway had been confined twice during the year preceding his criminal acts, and it was during a period of remission, which allowed his release, that he committed the crimes. Id. at 701. Although the Holloway opinion does not describe the events surrounding Holloway’s crimes, the supreme court stated that testimony supported that: Holloway’s mental condition at the time of the assault rendered him incapable of distinguishing between right and wrong; it comported with his ten-year confinement “as a mental case following the assault”; and the “opposing evidence [was] sketchy, general[,][and] supported only by slight circumstances....” Id. The supreme court also stated that “Holloway’s conduct immediately preceding and in the course of the assault was not inconsistent with that of a man suffering from a seriously disordered mind.” Id. at 701-02. Once again, although analogous, the Holloway case is distinguishable from the instant case. Testimony in the instant case established that Sanders’s actions were not those of a “disordered mind.” Rather, Sanders’s actions following the shootings reflect those of a cunning and calculated mind. Also, unlike Holloway, Sanders was not hospitalized multiple times within the year preceding his crime, nor was he confined after his crime.
¶ 60. Rather, testimony established that Sanders was capable of staying by himself and taking care of himself within days before the shootings. Also, as stated, he managed to live on his own for twenty years following the crimes by assuming aliases to protect his identity, even during periods of incarceration. Clearly, the jury found that Sanders suffered from a mental impairment to some degree, but it should be remembered that, despite testimony about the severity of Sanders’s mental condition, Sanders only spent about ten months in a mental-health facility because of attacks against his grandfather. And, despite Dr. McCoy’s recollection that Sanders was the most sick patient that had been at Mid-South, he admitted that Sanders’s medical records did not reflect that opinion. Rather, he simply remembered it that way more than twenty years and approximately 3,600 patients later. Furthermore, testimony established that there was no proof that Sanders ever took the anti-psychotic drugs the physicians prescribed for him, yet he managed to avoid further hospitalizations or commitments for more than twenty years. The instant case is distinguishable from Holloway, and it is supported by far more than “sketchy” evidence and “slight circumstances.”
¶ 61. Finally, in support of reversing his conviction and remanding the instant case for a new trial, Sanders relies upon Gambrell v. State, 238 Miss. 892, 902-03, 120 So.2d 758, 762-63 (1960). Yet again, there are glaring factual distinctions to be drawn between the cases. It was verified by many witnesses that Thomas Gambrell, a lawyer, clearly suffered from elaborate hallucinations that he was involved in covert investigations and espionage-type activity. Id. at 898-90, 120 So.2d at 760-61. Furthermore, the supreme court stated that just prior to the killing, Gambrell was “suffering from delusions of the most irrational nature,” and “[t]he State [had] made *573 what amounted to little more than a token effort to meet the burden of proving [Gam-brell] was sane.” Id. at 903, 120 So.2d at 762. The supreme court also stated that the State had offered no medical opinion on Gambrell’s sanity; the physician offered by the State had not examined Gam-brell; nor did the physician give an opinion on the insanity question. Id. The supreme court held that “[e]ven when viewed in the light most favorable to the State, it [was of the] opinion that ... the evidence [would] overwhelmingly convince any objective mind that [Gambrell] was insane at the time of the killing.” Id. at 903, 120 So.2d at 762-63. Unlike Gambrell, there was no eyewitness testimony that verified Sanders was suffering from delusions in the days preceding the shootings or at the time of the shootings, and the State offered competent medical evidence to show that Sanders was not insane at the time of the shootings.
¶ 62. Every witness that testified in support of Sanders’s insanity defense either had never seen Sanders before the shootings or had not seen him for an extended period of time after the shootings. The only persons that saw Sanders that fateful morning were Elma and W.D., and Elma told Puckett that Sanders killed W.D. in the midst of an argument, then went upstairs and shot her, hid the telephone, and left. Given the gross differences between the facts surrounding the murders in the instant case and the facts presented in Hawthorne, Holloivay, and Gambrell, it would be an injustice to usurp the judgment of the jury, which is the appropriate body to determine if one was legally insane at the time of a crime.
¶ 63. In addition to all of the evidence discussed above, the jury was presented with eyewitness testimony by Benny Parish, a jail administrator in Tishomingo County. Parish testified that Sanders’s first words to Jannie, after not seeing her for twenty years, were: “I’m sorry mom.” This, in addition to Sanders’s flight from the crime scene and Dr. McCoy’s testimony that Sanders told him that he was not hallucinating at the time of the shootings, present a scenario in which a reasonable juror could conclude that Sanders had knowledge that his actions were wrong at the time he shot Elma. Certainly, one of the clearest identifiers of guilty knowledge is trying to hide one’s crime and fleeing while no one pursues.
¶ 64. Truly, the jury was presented with the proverbial “battle of the experts.” And, all of the experts agreed that Sanders suffered from mental illness to some degree, whether or not it was caused or exacerbated by illegal drug use. However, as illustrated above, this Court is convinced that there was ample evidence from which the jury could agree with Dr. Lott and find that Sanders’s actions of concealing his crime and fleeing to another state indicated he knew his actions were wrong. Therefore, we find that this issue is without merit.
II. The circuit court erred in giving the State’s jury instruction on flight when the defense presented an independent reason for Sanders’s flight.
¶ 65. At the conclusion of the trial on the merits, the prosecution submitted jury instruction P-4 to the circuit court. Instruction P-4 read as follows:
The Court instructs the jury that flight is a circumstance from which guilty knowledge and fear may be inferred. If you find from the evidence in this case beyond a reasonable doubt, that the defendant, Keir D. Sanders, did flee from the scene of the death of W.D. Crawford, Jr. and the shooting of Elma Lee Crawford, then the flight of Keir D. *574 Sanders may be considered in connection with all other evidence in the case. You may determine from all if the facts whether the flight was from a conscious sense of guilt or whether it was caused by other things, and give it such weight as you think it is entitled to in reaching verdicts in this case.
Sanders’s defense counsel objected to the instruction based upon the argument that both Dr. McCoy and Dr. Webb provided a basis for Sanders’s flight unconnected from his guilt. However, the circuit court nevertheless granted the prosecution’s instruction. On appeal, Sanders echoes the point of error raised at the trial level and argues that it was error for the circuit court to instruct the jurors that they may have considered flight as evidence of guilt as Dr. McCoy and Dr. Webb provided an independent reason for Sanders’s flight.
¶ 66. Our supreme court has held that “flight is admissible as evidence of consciousness of guilt.” Fuselier v. State, 702 So.2d 388, 390 (¶ 4) (Miss.1997). However, such an instruction “is appropriate only where that flight is unexplained and somehow probative of guilt or guilty knowledge.” Id. (quoting Reynolds v. State, 658 So.2d 852, 856 (Miss.1995)). Any explanation given in an effort to show an independent reason for flight must not be contradicted by other evidence presented at trial. Shumpert v. State, 935 So.2d 962, 969-70 (¶¶ 25-28) (Miss.2006).
¶ 67. Sanders argues that Dr. McCoy’s and Dr. Webb’s statements provided a valid explanation for his flight after the murders.[7] Specifically, in response to being asked about Sanders’s flight, Dr. McCoy stated:
Well if somebody is going to kill you, and it’s more than them, he’s hearing the voices — the voice of demons, which is pretty common. As weird as that sounds, that’s the way it usually is. And there are demons present in the house, forces trying to kill him, we can’t fathom what the details are. It’s so bizarre. All this happening, he was running — in his mind he was running for his life.
However, Dr. McCoy also testified that Sanders told him he was not hallucinating at the time of the murders and never definitively stated that he was hearing voices at the time of the murders. Furthermore, Dr. McCoy admitted that he had not seen Sanders for approximately two years prior to the killings and did not know what he was thinking at the time he killed his grandparents. When asked about the fact that Sanders was missing for twenty years, Dr. McCoy stated that there were probably times when Sanders was lucid and “during those time he may have thought that — he probably did think that he had committed two murders and that he was, if he got arrested, that he was going to get the severe penalty.” Finally, when asked to explain Sanders’s act of hiding the telephone, Dr. McCoy testified that “[fit’s strange, you know. You would think he [would have] jerked the phone out of the wall, throw[n] it across the room and run out [of] the door. It’s odd. It’s strange.”
¶ 68. In response to a similar question regarding whether Sanders’s flight indicated whether he knew right from wrong, Dr. Webb responded that it did not and that Sanders was scared of his thoughts and that someone may hurt him. However, as *575 with Dr. McCoy, Sanders never told Dr. Webb that he fled because he was scared of being hurt by unseen forces. At best, Dr. McCoy’s and Dr. Webb’s beliefs about why Sanders ran were educated guesses based upon Sanders’s history of mental illness and were neither based upon his actions immediately before or after the murders, nor were they wholly consistent with the facts surrounding the murders. Further more, Dr. Lott testified that in his opinion Sanders’s actions after the murders, i.e. unplugging and hiding the telephone, fleeing to a different state, using aliases to conceal his identity, indicate knowing concealment and well-reasoned behavior. Therefore, we find that the circuit court did not err in granting the prosecution’s instruction on flight. This issue is without merit.
III. The circuit court erred by admitting gruesome autopsy photographs of the victims into evidence.
¶ 69. During the trial, Sanders objected to the admission of three photographs that were taken during the autopsy of W.D. The prosecution planned to use the photographs to illustrate the deposed testimony of Dr. Tom McLees during the reading of his deposition. After argument from both Sanders and the prosecution, the circuit court overruled Sanders’s objection, stating:
The Court is of the opinion that these photographs, while they are admittedly not very pleasant to view, I have never seen photographs of a victim in a murder case that were anything other than that. They do have evidentiary value in demonstrating very clearly for the jury what the injuries sustained by [W.D.] were, the shot and bludgeoned. And further in consideration of the probative value, that is demonstrating clearly the injuries which he received as opposed to the prejudicial effect of these, I think the probative value outweighs any possible prejudicial effect.
As to the use of an overhead projector, it is utilitarian and sufficient in its allowing the jury to see all of these at one time. Therefore, the objection to the use of the overhead projector is likewise overruled.
The deposition of Dr. McLees was subsequently read to the jury. Sanders argues that because: there was no question surrounding the specifics of W.D.’s death; there was other evidence admitted depicting W.D.’s injuries; and the fact that W.D. was murdered was stipulated to, it was error for the circuit court to admit the photographs taken during W.D.’s autopsy as they were more prejudicial than probative of Sanders’s guilt.
¶ 70. “Admission of photographs by the trial court is reviewed for abuse of discretion.” Chamberlin v. State, 989 So.2d 320, 340 (¶73) (Miss.2008). Such discretion is “almost unlimited ... regardless of the gruesomeness, repetitiveness, and the extenuation of probative value.” Id. (quoting Dampier v. State, 973 So.2d 221, 230 (¶ 25) (Miss.2008)). Nevertheless, “photographs of the victim should not ordinarily be admitted into evidence where the killing is not contradicted or denied, and the corpus delicti and the identity of the deceased have been established.” Id. at (¶ 72) (quoting Sudduth v. State, 562 So.2d 67, 70 (Miss.1990)). Regardless, such photographs may be admitted when they have probative value and are not overly prejudicial and inflammatory. Id. Indeed, “[s]o long as a photograph has probative value and its introduction serves a meaningful evidentiary purpose, it may still be admissible despite being gruesome, grisly, unpleasant, or even inflammatory.” Id. at (¶ 73) (quoting Dampier, 973 So.2d at 230 *576 (¶ 25)). Meaningful evidentiary purpose is found when the photograph: “(1) aids in describing the circumstances of the killing; (2) describes the location of the body or cause of death; or (3) supplements or clarifies witness testimony.” Id.
¶ 71. Sanders’s stipulations at trial notwithstanding, where photographic evidence has probative value, such stipulations will not hinder the admissibility of the evidence at trial. Noe v. State, 616 So.2d 298, 303 (Miss.1993). The photographs in question depict the number and type of wounds inflicted upon W.D. Additionally, they were admitted in conjunction with the reading of the deposition of Dr. McLees. We find that the photographs had probative value in that they helped clarify the deposition testimony of Dr. McLees. Additionally, we find that the probative value of the photographs outweighed any prejudicial effect they may have had, especially given the evidence against Sanders. Although the photographs in question are gruesome, as the circuit court pointed out, photographs depicting the body of a murder victim can hardly be described as anything but gruesome.
¶ 72. Furthermore, we find that the circuit court did not abuse its discretion in allowing the prosecution to use a projector to display the photographs. “[U]se of a projector to enhance the testimony of a witness is within the discretion of the trial court, and is encouraged — to the extent it ‘aids the jury in understanding the witness or other evidence’ ” so long as the purpose for using the projector was not to inflame the jury. Brawner v. State, 872 So.2d 1, 14-15 (¶ 41) (Miss.2004) (citations omitted). The objected-to photographs in Brawner were: on a projector that was 24 to 30 feet from the jury, enlarged to approximately 40" by 60" and shown to the jury for approximately 30 seconds each. Id. at 15 (¶ 42). Although such specifics concerning the use of a projector are not clear from the record in this case, we note that as in Brawner, “[t]here is no evidence in the record that the jury was inflamed from this presentation of the photos. Neither does the defendant cite a case supporting his assertion that the mere presentation of photographs in this manner is inflammatory.” Id. Therefore, as neither the admission of the photographs nor the use of a projector to show them were an abuse of discretion by the circuit court, we find that this issue is without merit.
IV. The circuit court erred by requiring Sanders to serve the life sentence pursuant to Count II before being conveyed to the state mental hospital pursuant to Count I.
¶ 73. As a result of the jury’s finding of guilt for the murder of his grandmother as charged in Count II and his previous convictions, Sanders was sentenced as a habitual offender under Mississippi Code Annotated section 99-19-81 to life without eligibility for parole or probation in the custody of the Mississippi Department of Corrections. Additionally, the jury found Sanders not guilty by reason of insanity for the killing of his grandfather, as charged in Count I. As a result of this verdict, the circuit court ordered Sanders to be conveyed and confined in the Mississippi State Hospital at Whitfield, Mississippi or at such other appropriate state asylum, until such time as his sanity has been restored, and ordered both the order of confinement and sentence of incarceration to run consecutively. However, the trial court suspended its order stemming from Count I until Sanders had been discharged from the custody of the Mississippi Department of Corrections in *577 connection with his sentence of incarceration imposed in Count II.
¶ 74. Sanders argues that the circuit court did not have the authority to order the confinement and imprisonment to run consecutively; therefore, he should be first committed to and confined in a state asylum for the insane. As this appears to be an issue of first impression, Sanders cites to the applicable code sections as support for his argument. Specifically, Mississippi Code Annotated section 99-13-7 (Rev. 2007), which provided at the time of Sanders’s sentencing that:
When any person shall be indicted for an offence and acquitted on the ground of insanity the jury rendering the verdict shall state therein such ground and whether the accused has since been restored to his reason, and whether he is dangerous to the community. And if the jury certify that such person is still insane and dangerous[,] the judge shall order him to be conveyed to and confined in one of the state asylums for the insane.
Further, Sanders contends that the statute that gives a trial court the discretion to order multiple sentences to run consecutively or concurrently, namely, Mississippi Code Annotated section 99-19-21(1) (Rev. 2007), does not apply to his order of commitment in Count I.
¶75. As noted above on Count II, Sanders was sentenced in accordance with section 99-19-81, which provides in part that those persons who have been convicted twice previously and sentenced to separate terms of one year or more for each previous sentence “shall be sentenced to the maximum term of imprisonment prescribed for such felony, and such sentence shall not be reduced or suspended ...” in connection with a current felony conviction. Miss.Code Ann. § 99-19-81. The language of section 99-19-81 mirrors that of section 99-13-7 in that both instruct a trial court that it “shall” impose a sentence and order confinement in a state asylum, respectively. Therefore, the circuit court was presented with two courses of action, both of which seem to be mutually exclusive, and it was statutorily mandated to comply with both.
¶ 76. Adding to the confusion, given the circuit court’s order, is the fact that Sanders is correct in his contention that section 99-19-21(1) does not apply in this situation. It provides that: “When a person is sentenced to imprisonment on two (2) or more convictions, the imprisonment on the second, or each subsequent conviction shall, in the discretion of the court, commence either at the termination of the imprisonment for the preceding conviction or run concurrently with the preceding conviction.” Miss.Code Ann. § 99-19-21(1). Sanders was not convicted on Count I, and he could not be sentenced of a second offence as the jury acquitted him by reason of insanity of the killing of his grandfather. However, the circuit court’s lack of discretion notwithstanding, its order is a correct application of the law.
¶ 77. Given that the applicable sections 99-13-7 and 99-19-81 require a trial court to order and sentence, respectively, a defendant to two completely different locations for different purposes, the labeling of consecutive or concurrent that is attached to the order and sentence is moot as it is an impossibility for a defendant to be at two places at once; and fulfillment of one obligation has no bearing on the fulfillment of the other. The only possibility is for the order and sentence to run consecutively. Therefore, what determines the timing of the imposition of the order or sentence in this case is the language of section 99-19-81 and simultaneous lack of language from section 99-13-7.
¶ 78. As noted above, the circuit court was compelled to comply with both sec *578 tions 99-13-7 and 99-19-81. That being the case, we must determine how these code sections interact. While both instruct a trial court that it “shall” take a certain course of action, only section 99-19-81 further provides that that course of action, namely imposing the maximum sentence for the underlying felony, “shall not be reduced or suspended.” Section 99-13-7 does not contain such a restriction. Therefore, Sanders's order of commitment stemming from the jury’s finding of not guilty by reason of insanity in Count I had to be suspended by operation of section 99-13-7’s conflict with a simultaneous conviction of guilt and sentencing under section 99-19-81, the latter being explicitly immune from suspension. The circuit court recognized this and stated the following in its order:
Under other circumstances this court would on a [finding of not guilty by reason of insanity and further finding that Sanders had not been restored to his reason and constituted a danger to the community] commit him to the custody of one of the state asylums for the insane as provided in Miss. Code Ann. [s]ection 99-13-7.
Because the defendant is sentenced in Count II of this indictment for murder under section 99-19-81 the execution of commitment of the defendant to one of the state asylums is to be suspended....
Therefore, we find that the circuit court properly exercised its discretion in requiring Sanders to serve first his mandatory life sentence before his term of an indefinite confinement in a mental institution. As such, this issue is without merit.
¶ 79. THE JUDGMENT OF THE CIRCUIT COURT OF TISHOMINGO COUNTY OF ACQUITTAL BY REASON OF INSANITY OF COUNT I, MURDER, AND ORDER OF CONFINEMENT IN A STATE ASYLUM FOR THE INSANE, ORDER SUSPENDED, AND CONVICTION OF COUNT II, MURDER, AND SENTENCE AS A HABITUAL OFFENDER OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS TO RUN CONSECUTIVELY WITH THE ORDER IN COUNT I, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO TISHOMINGO COUNTY.
LEE AND MYERS, P.JJ., IRVING, GRIFFIS AND MAXWELL, JJ., CONCUR. ISHEE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, C.J., AND BARNES, J.

. At trial, Sanders was convicted as a habitual offender under Mississippi Code Annotated section 99-19-81 (Rev.2007). The record reflects that on August 4, 1994, Sanders was convicted in the 290th District of Bexar County, Texas under the alias of David Matthews of delivery of twenty-eight grams of cocaine. He pled guilty and received a term of ten years with the sentence to be suspended, and he was placed on community supervision for ten years. On June 21, 2001, Sanders was convicted in the 379th District of Bexar County, Texas under the alias of Montague David Ford of burglary of a building and sentenced to a term of one year in the Bexar County Jail. Sanders entered a plea of nolo contende-re on the burglary charge. At the time of sentencing on the burglary charge, Sanders had been in custody for a period of 151 days. Both judgments related to these charges reflect that the courts found that Sanders appeared competent to stand trial, and that he was not influenced as to making his plea(s). Also, the record does not reflect that any court or penal system found Sanders to be incompetent during these periods of incarceration and/or supervision or that Sanders was adjudicated legally insane or mentally ill under one of his six aliases while living in Texas.

. Testimony by Dr. McCoy established that Sanders was sent to Mid-South because of a physical altercation between him and his grandfather. Dr. McCoy stated that there were a couple of possible stories, but he thought it was because Sanders “ended up before the juvenile judge,” and the "juvenile judge” had Sanders committed to Mid-South.

. Apparently, Dr. McCoy and Dr. Ciocci were not called as witnesses in Sanders's first trial, which was held in Lafayette County, Mississippi. Sanders's first trial resulted in a deadlocked jury, and a mistrial was ordered. At Sanders’s trial in Lee County, Sanders stated that he had only learned of Dr. McCoy and Dr. Ciocci a week or so before the second trial.

. Dr. McCoy had not definitively stated in his report that Sanders knew the nature and quality of his actions. At trial, he acknowledged that he had stated it could be "either/or” whether Sanders knew the quality of his actions. In other words, it appears Dr. McCoy’s report found that Sanders did not know the nature or quality of his actions, or if Sanders did know the nature and quality of his actions, he did not know they were wrong. Apparently, Dr. McCoy only became decisive about his diagnosis at trial.

. At trial, Dr. Lott submitted his extensive qualifications. At the time of trial, Dr. Lott had been the clinical director for St. Dominic’s Hospital in Jackson, Mississippi for eight and one-half years, and he maintained a private forensic practice. Prior to his employment with St. Dominic's, he was the clinical director of the Baptist Chemical Dependency Center for nearly five years, and prior to that, he was the clinical director of the Outpatient Forensic Services at Whitfield. Dr. Lott, who holds a master’s degree and a Ph.D. in clinical psychology had been called upon, mainly by the courts, to conduct between 1,000 and 2,000 forensic interviews to determine an individual's capacity to stand trial, and he was to determine his or her mental state at the time of the alleged offense. Dr. Lott’s extensive experience is detailed in order to establish that, unlike some of the situations presented in the case-law analysis below, the State presented competent evidence to support the jury's verdict.

. According to the Palo Alto Medical Foundation, Quaaludes are depressants that are usually taken in pill form. They may cause euphoria and reduce inhibitions. The consequences of taking these pills can include depression, poor reflexes, slurred speech, and even coma, http://www.pamf.org/teen/risk/ drugs/depressants/quaaludes.html. Testimony established that Sanders, at times, had difficulty "holding utensils," and he ran through the neighborhood in such a manner that there was concern that neighbors may shoot at him. Considering the effects that these types of drugs have, perhaps, Dr. Lott was correct in his assumption that some of Sanders’s behavior or illness could have been caused or exacerbated by illegal drug abuse.

. Sanders cites Hawthorne as support for his argument. However, as detailed above in the first issue addressed, the circumstances surrounding the defendant’s flight in Hawthorne are readily distinguishable from those present in this case. Additionally, as Sanders points out, the issue of whether giving a flight instruction was proper was not addressed in Hawthorne.